STATE of Minnesota, Respondent,

v.

James Herman O'HAGAN, Appellant.

No. C5–90–2246.

Court of Appeals of Minnesota.

Aug. 27, 1991.

Review Denied Sept. 25, 1991.

**614**

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Lisa A. Berg, Asst. County Atty., Minneapolis, for respondent.

William J. Mauzy, Mauzy & Short, Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and FOLEY and THOREEN *, JJ.

## OPINION

PARKER, Judge.

On January 5, 1990, appellant James H. O'Hagan was charged by complaint filed in Hennepin County District Court with eight counts of theft in violation of Minn.Stat. § 609.52, subds. 2(1), 2(5)(a) (1986) (by temporary control), and nine counts of theft in violation of Minn.Stat. § 609.52, subd. 2(4) (1986) (by swindle). The charges arose out of allegations that O'Hagan, an attorney, illegally handled monies in client settlement funds. At trial O'Hagan admitted to his personal use of the monies, but claimed he had permission to do so.

After a lengthy jury trial, O'Hagan was convicted of the eight counts of theft by temporary control and found not guilty on the six theft by swindle charges. The trial court sentenced him to eight concurrent, executed prison terms and imposed the maximum fine of $20,000 on each conviction, for a total fine of $160,000. Four of the sentences represent upward durational departures and the other four sentences represent both dispositional and durational upward departures.

This appeal is taken from the judgment of conviction. O'Hagan challenges the sufficiency of the evidence, the evidentiary rulings, the jury instructions, and the sentences imposed. He also argues that two of the theft counts were barred by the statute of limitations. We affirm.

## FACTS

Between 1963 and 1989, O'Hagan practiced law with the firm of Dorsey & Whitney in Minneapolis, Minnesota. O'Hagan was a successful attorney, highly respected by clients and fellow attorneys. He became a senior partner in the firm and handled many major litigation matters, specializing in medical malpractice and securities cases. Although a partner, he enjoyed much independence and, to some extent, could be viewed as operating his own practice within the firm. During the period of 1986 to 1988, he was the number one or number two producer for the Dorsey firm, with annual billings in excess of $2 million.

### Northrup King Settlement Funds

From the late 1970's until November 1989, O'Hagan defended Northrup King & Co. and its parent Swiss corporation, Sandoz, Inc., against a class action suit known as the *Boose* litigation. Northrup shareholders brought suit against Northrup, claiming they had been misled by a 1975 press release. The shareholders alleged the release, which had been issued shortly before Sandoz acquired Northrup, improperly misled them as to the likelihood of a takeover by Sandoz and that they sold their shares, to their detriment, in reliance on the press release.

Richard Burt was the general counsel for Sandoz. Burt had settlement authority and was responsible for the *Boose* litigation on behalf of Northrup and Sandoz. The shareholders were represented by the law firm of Popham, Haik, Schnobrich & Kaufman.

On October 17, 1986, shortly before trial was to commence, the parties reached an oral agreement to settle for two dollars per share, up to a maximum of $1 million. Accounting for the interest on the $1 million had not yet been discussed. On Octo-

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment

pursuant to Minn.Const. art. VI, § 2.

ber 29, 1986, Northrup wired $1 million to the Dorsey general trust account. On the same day, at O'Hagan's direction, $500,000 of the $1 million was transferred out of the Dorsey general trust fund into a separate, interest-bearing account. The interest-bearing account was entitled "Dorsey & Whitney as trustee for Northrup King" (Northrup account). O'Hagan was the sole authorized signer on the account. Also at O'Hagan's direction, two checks dated October 30, 1986, were drawn on the remaining $500,000 in the Dorsey general trust account. One was in the amount of $350,-000 payable to First Bank Minneapolis and the other was in the amount of $150,000 payable to the Dakota State Bank. It was later discovered that these two checks went toward paying off loans O'Hagan had at the above-named banks. O'Hagan was not charged with diversion of these funds ($350,000 and $150,000), because any charges were barred by the three-year statute of limitations.

However, on January 7, 1987, three checks were drawn, at O'Hagan's direction, on the other $500,000 which had been previously transferred to the interest-bearing Northrup account: (1) $135,000 payable to Investor's Savings Bank; (2) $30,000 payable to National City Bank; and (3) $85,000 payable to National City Bank. Similarly, on February 27, 1987, at O'Hagan's direction, a check was drawn on the Northrup account for $250,000 payable to Dakota County State Bank. These withdrawals form the basis of counts I and II of the complaint.

Richard Burt testified that although he had overall responsibility for the *Boose* litigation on behalf of Sandoz and Northrup, he had little or no recollection of the settlement. Burt testified that he did not remember, but he assumed that the settlement funds were handled according to "standard practice," meaning that "funds left with an attorney for any purpose of the client are not [to be] used by the attorney." He did not recall giving O'Hagan any authority to transfer money from the settlement fund to his own loan accounts. Burt also had no recollection of discussing or giving O'Hagan authority to use or retain the interest on the money placed in the settlement fund.

O'Hagan admits he applied the money to his own personal use. He testified he did not ask Burt if he could borrow the money and that Burt never gave him express permission to use the money. However, O'Hagan believed he had "discretion" to use the money, so long as it was repaid with full interest when it was due.

It took until July 1988 for plaintiffs' counsel to locate all of the class members and process the claims. The court approved payments to the class and plaintiffs' counsel in August 1988, and thereafter substantially all of the $1 million was paid out to the class and plaintiffs' counsel. O'Hagan had transferred nearly all of the $1 million back into the Dorsey general trust account prior to the time it was to be paid to the class and plaintiffs' counsel.

The final Northrup settlement document was silent on the question of who would receive the interest on the escrow funds. In the fall of 1989, however, the IRS conducted an audit of Northrup and made inquiries about the interest on the $1 million. Edward Resler, Northrup's then-assistant general counsel, contacted Dorsey. In November 1989 Dorsey advised O'Hagan that it had audited the *Boose* litigation account and that it intended to pay the interest to Northrup. O'Hagan then paid Dorsey, which thereafter returned the interest money to Northrup. Because of the inquiry by Resler into the Northrup litigation, Dorsey conducted an audit of all of O'Hagan's trust accounts in November 1989.

Regarding the Northrup funds, O'Hagan was charged with two counts of theft for the withdrawals occurring on January 7, 1987, and February 27, 1987. These are counts I and II of the complaint. The jury found O'Hagan guilty of these charges.

### Mayo Clinic Settlement Funds

Since 1970, O'Hagan had been the lead lawyer for the Mayo Clinic in medical malpractice litigation. Benjamin Hippe has

been in the office of the general counsel for Mayo since 1962. O'Hagan and Hippe had worked closely together since 1970 and had developed a close professional relationship. O'Hagan represented Mayo in three lawsuits which are here relevant.

In January 1987 a lawsuit was brought against Mayo on behalf of a child, represented by attorney John Carey. Carey testified that the parties settled for $270,000. According to Ben Hippe, however, O'Hagan told Hippe the case settled for $595,-000. A check for the latter sum from Mayo, dated January 16, 1987, was deposited into an interest-bearing account, with O'Hagan as the sole signer on the account. Subsequently, a check was drawn for $270,-000 for John Carey and his client. At O'Hagan's direction, the remaining $325,-000 was distributed from the account on January 22, 1987, by three cashier's checks: $100,000 payable to Wayzata Bank and Trust Company; $100,000 payable to Investor's Savings Bank of Minneapolis; and $125,000 payable to Dakota County State Bank. It was later discovered these checks went to pay off loans on accounts belonging to O'Hagan.

The next case involved attorney Reed Mackenzie. During Mackenzie's investigation of his client's case, he hired an expert to evaluate the damage caused by a mistake that occurred during surgery. The expert believed the damage was not a result of the mistake. Mackenzie disclosed this information to O'Hagan and asked for a settlement of $25,000. O'Hagan told Ben Hippe, however, the case settled for $250,-000.

On October 16, 1987, a check from Mayo for $225,000 was deposited in a Dorsey trust account. On October 19, 1987, at O'Hagan's direction, a check was drawn from the account for $200,000 payable to Dakota County State Bank. On November 5, 1987, another check was drawn from the account for $25,000 payable to Dakota County State Bank. Sometime later $25,-000 was paid to the Mackenzie client by a check drawn on the general Dorsey trust account.

The third case involved a nurse at St. Mary's Hospital who accidentally disconnected a young boy's respirator. The respirator was improperly reconnected and the boy suffered serious brain damage. In December 1987 a suit on behalf of the boy was brought against Mayo. The boy was represented by Chicago attorney Bruce Goodman. O'Hagan offered to settle the case for $900,000. Goodman refused. During the week of December 20, 1987, Hippe and O'Hagan discussed settling the case quickly for $1.5 million, but plaintiff's counsel never received an offer for that amount.

Hippe testified that he requisitioned $1.5 million from Mayo and sent it to O'Hagan on December 29, 1987, because O'Hagan told him the case had been settled. The money was put into a client trust fund. Hippe testified that shortly after the money had been sent to Dorsey, O'Hagan told him that Goodman's local counsel, Mark Hallberg, had earlier agreed to take the $1.5 million but that Goodman was now reneging. Hippe testified that he and O'Hagan decided to leave the $1.5 million in the Dorsey trust account because they were considering asking the court to enforce the agreement, and the money's availability would lend credence to their claim that the parties had reached an agreement.

On December 31, 1987, at O'Hagan's direction, a check was drawn from the Goodman client fund in the amount of $25,000 and deposited in the Dorsey general trust account, replacing the $25,000 O'Hagan had paid earlier that month to the MacKenzie client. On December 31, 1987, at O'Hagan's direction, two checks were drawn on the Goodman account: $295,000 payable to Dakota County State Bank and $105,000 payable to Investor's Savings Bank. Subseuently, at O'Hagan's direction, the following checks were also drawn on the account:

| Jan. 20, 1988 | Dakota County State Bank | $ 75,000 |
| Jan. 29, 1988 | Dakota County State Bank | 100,000 |
| Feb. 9, 1988 | Dakota County State Bank | 295,000 |
| Mar. 8, 1988 | Dakota County State Bank | 300,000 |
| Mar. 17, 1988 | Investor's Savings Bank | 105,000 |
| Mar. 17, 1988 | Dakota County State Bank | 109,050.54 |

During the week of October 15, 1989, O'Hagan and Hippe concluded that the Goodman client case was not going to be settled in the near future. Believing the money was in a Dorsey trust account, Hippe asked that the money be returned to Mayo. Within several days O'Hagan gave Hippe a check for $1.7 million.

Regarding the Mayo funds, the state charged O'Hagan with nine counts of theft by swindle and six counts of theft (by temporary control). The jury found O'Hagan not guilty on all of the theft by swindle charges, but found him guilty on the six temporary taking counts.

## ISSUES

1. Is the evidence sufficient to support O'Hagan's convictions of theft by temporary control?

2. Did the trial court err in its evidentiary rulings?

3. Did the trial court err in its instruction to the jury regarding the meaning of the phrase "manifests an indifference to the rights of the owner or to the restoration of the property to the owner" in connection with the elements of theft by temporary control?

4. Are counts I and II barred by the statute of limitations?

5. Did O'Hagan's conduct represent only two behavioral incidents, one involving the Northrup funds and one involving the Mayo funds?

6. Did the trial court abuse its discretion by departing durationally upward on all eight of the sentences imposed and departing dispositionally upward on four of the sentences imposed?

## DISCUSSION

### I

When the sufficiency of the evidence is raised on appeal, our review is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). In making this determination, we must "assume the jury believed the state's witnesses and disbelieved any contrary evidence." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn.1980).

This case turns on assessment of witness credibility, which is in the exclusive province of the jury. *Pieschke*, 295 N.W.2d at 584. O'Hagan's version of the facts is that he merely "borrowed" the monies in the various settlement funds. He claims he had the permission of his clients to do so and that he had the ability to pay back the "loans" at any given time. However, Richard Burt testified he did not remember giving O'Hagan authority to use the Northrup funds for his own personal use. Similarly, Benjamin Hippe testified he did not give O'Hagan permission to borrow the Mayo funds. O'Hagan admits he used the money for "investments" and to pay off personal loans.

Based on the evidence presented at trial, when viewed in the light most favorable to the state, the jury could find that O'Hagan used the funds, without permission, for his own benefit. The jury could also find he exposed those funds to a risk of being lost. Further, the jury could find O'Hagan's actions manifested an indifference to the rights of the owners or the restoration of the money. *See* Minn.Stat. § 609.52,

subds. 2(1), 2(5)(a). The evidence is sufficient to sustain O'Hagan's convictions.

## II

 Over defense counsel's objection as an "improper question," the following colloquy took place during redirect examination of Ben Hippe:

Q: Mr. Hippe, you have been on the witness stand here testifying in the case about Mr. O'Hagan and you know he's the defendant. *How do you feel about Mr. O'Hagan at this point?*

A: * * * I guess first of all, I'm partly embarrassed by the fact that I apparently was—my trust was abused in this way. I'm really, more importantly, kind of heartbroken that 20 years of work and for all of the physicians and doctors at the Mayo Clinic who feel close to him that they should be treated in this way.

O'Hagan's defense was based in part on his claim that Hippe had authorized him to borrow the settlement monies for his personal use. To lend credence to this claim, defense counsel focused on the close personal, as well as professional, relationship between O'Hagan and Hippe. The nature of the relationship was emphasized during both the opening statement for the defense and during cross-examination of Hippe. The question here at issue, which came on redirect, asks Hippe for his assessment of the closeness of their relationship. The objection made, an "improper question," was nonspecific, giving little assistance to the trial court regarding the claimed impropriety of the question. Given the nature of the focus of O'Hagan's defense, Hippe's feeling toward O'Hagan is relevant evidence. Any prejudicial effect of the testimony is outweighed by its probative value to the resolution of the facts as to the nature of the relationship. *See* Minn. R.Evid. 403.

Further, O'Hagan's and Hippe's testimony was in direct conflict. O'Hagan testified that Hippe had authorized him to borrow Mayo settlement funds, while Hippe testified he never gave O'Hagan permission to use the funds, nor did he know O'Hagan was using the funds. The credibility determination was crucial to the outcome of the case. Upon scrutiny of the record, we find the question was not improper but was merely an attempt to discredit O'Hagan's version of the facts. We find no abuse of the trial court's discretion in admitting the testimony. *See State v. Olkon,* 299 N.W.2d 89, 101 (Minn.1980) (evidentiary rulings rest within the sound discretion of the trial court).

 O'Hagan also challenges the introduction into evidence, over objection, of a draft of a financial statement prepared by O'Hagan in the context of an investigation conducted by the SEC. The statement, dated November 29, 1989, reported that O'Hagan's net worth was $967,000. Defense counsel argued the document was inadmissible because it was prepared for submission to the SEC in connection with settlement negotiations of that case, entirely separate from the case at bar.

Rule 408 of the Minnesota Rules of Evidence provides:

Evidence of (1) furnishing or offering or promising to furnish * * * a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, *is not admissible to prove liability for or invalidity of the claim or its amount, Evidence of conduct or statements made in compromise negotiations is likewise not admissible.* This rule does *not* require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. *This rule also does not require exclusion when the evidence is offered for another purpose,* such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(Emphasis added.)

The financial statement was offered to show that O'Hagan did not have the ability to repay the "borrowed" funds at any and all times, as O'Hagan maintained. The document was not offered to prove the

validity of any SEC claims. The relevance of the financial statement to *this* case, i.e., O'Hagan's ability to repay the "borrowed" funds at any and all times, does not depend on any inference that the SEC, in an entirely different case, may have a valid civil claim against him. (The fact that there was an SEC investigation was not disclosed to the jury.) The trial court did not err by admitting the financial statement into evidence.

O'Hagan argues that in *State v. Jackson*, 325 N.W.2d 819, 822 (Minn.1982), the supreme court stated in dictum that evidence of offers to compromise a civil lawsuit would not be admissible in the criminal case. We do not so read the case. *Jackson* merely states that evidence of plea-related statements is inadmissible in a criminal prosecution in the event plea negotiations abort. *Id.* at 822. The financial statement here at issue has nothing to do with plea negotiations. O'Hagan also relies on *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir.1981), wherein an architect's report prepared to facilitate settlement negotiations was held inadmissible under Rule 408. *Ramada* is not applicable; there the report was prepared specifically for that case and was not being used in a criminal prosecution unrelated to the civil action.

### III

■ O'Hagan was convicted of two counts of theft in connection with the Northrup funds and six counts of theft in connection with Mayo funds. All eight convictions were for theft by exercising temporary control in violation of Minn.Stat. § 609.52, subds. 2(1) and 2(5)(a) (1986), which provides in pertinent part:

> [W]hoever does any of the following commits theft * * * (1) intentionally and without claim of right takes, uses, transfers, conceals, or retains possession of moveable property of another without the other's consent and with * * * (5) * * * intent to exercise temporary control only and; (a) the control exercised manifests an indifference to the rights of the owner or the restoration of the property to the owner.

Regarding the last element of the offense, "manifests an indifference to the rights of the owner or the restoration of the property," the trial court gave the following instruction to the jury:

> What constitutes such, quote, indifference, unquote, is a matter of construction and, in a sense, a matter of degree. The statute contemplates such acts as using or abusing the property in a manner that exposes it to risk of damage, or using it so that it is in fact damaged. Examples might be leaving the property at some location where it may or may not be found, the defendant being unconcerned whether it is recovered or not, leasing, renting or borrowing the property for a period and continuing to use it beyond the period, the defendant being unconcerned with whether the owner desires either its return or compensation for the added use.
>
> These examples of misuse of another's property are temporary control exercised by a defendant over property manifesting an indifference to the rights of the owner or the restoration of the property to the owner.

O'Hagan argues the trial court committed prejudicial error because it refused to include an element of "willful, reckless, or malicious disregard" of the owner's rights in the definition of indifference. Specifically, O'Hagan requested the following instruction:

> [M]anifested an indifference * * * means that the defendant must have intentionally exercised control over the money in such a manner as to recklessly expose it to a great risk of permanent loss or substantial injury so high as to manifest willful, reckless or malicious disregard of the rights of the owner as to whether the property is restored intact to its owner.

Refusal to give a proposed jury instruction lies within the discretion of the trial court and there is no error absent an abuse of discretion. *State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985).

Citing a 1953 draft of the model penal code, O'Hagan argues that legislative history supports his proposed instruction. As the state points out, however, the recklessness element did not survive the ultimate draft of the model penal code. The trial court's instruction was taken directly from a 1963 article written by Professor Maynard Pirsig. *See* Pirsig, *Proposed Revision of the Minnesota Criminal Code,* 47 Minn.L.Rev. 417, 439 (1963).

In discussing section 609.52, subd. 2(5)(a) (theft by temporary control), in the context of an unauthorized use of a motor vehicle, the Minnesota Supreme Court has held that where the defendant took a truck without consent and drove it to Altoona, Iowa, and abandoned it, leaving the keys under one of the front tires, the defendant's conduct manifested an "indifference" to the rights of the owner or the restoration of the property. *State v. Beito,* 332 N.W.2d 645, 648–49 (Minn.1983). Although jury instructions were not at issue in *Beito,* the holding of the case supports the instructions given here: "leaving the property at some location where it may or may not be found * * * unconcerned whether it is recovered or not."

It has long been clear that "words of common usage within the ordinary understanding of a juror need not be defined by the court." *State v. Heinzer,* 347 N.W.2d 535, 537 (Minn.App.1984). "Indifference" is defined as "lack of concern, interest, or feeling; apathy." Webster, *New Universal Unabridged Dictionary,* 2d 1983. The plain meaning of the phrase does not include an element of "willful, reckless or malicious disregard." We find no abuse of discretion in the trial court's refusal to give O'Hagan's proposed jury instruction.

## IV

On October 29, 1986, Northrup wired $1 million to the Dorsey general trust account. On the same day, at O'Hagan's direction, $500,000 of the $1 million was transferred out of the Dorsey general trust account into a separate, interest-bearing account with O'Hagan as the sole authorized signer thereon. It was not until January 7, 1987, that three checks were drawn, at O'Hagan's direction, on this $500,000. These three checks totaled $250,000 and went toward paying off O'Hagan's loan accounts. Similarly, on February 27, 1987, at O'Hagan's direction, a check was drawn from the Northrup account for $250,000 and went toward paying off another of his loan accounts. These withdrawals, occurring on January 7 and February 27, 1987, form the basis of counts I and II of the complaint.

O'Hagan argues that the statute of limitations regarding these Northrup funds began to run on October 29, 1986, the day the $500,000 was transferred, at his direction, from the Dorsey general trust account to a separate, interest-bearing account on which his was the sole authorized signature. Thus, he argues, the counts involving the Northrup funds were barred by the three-year statute of limitations because the complaint was not filed until January 5, 1990. We are not persuaded by this construction.

Counts I and II of the complaint allege that O'Hagan "took, used, transferred, concealed or retained possession of U.S. Currency" belonging to Northrup King and Dorsey & Whitney in violation of Minn. Stat. § 609.52, subds. 2(1) and 2(5)(a) (theft by temporary control). In Minnesota, "possessing stolen property and concealing stolen property are continuing offenses for the purpose of the statute of limitations." *State v. Fernow,* 354 N.W.2d 438, 439 (Minn.1984); *see also State v. Lawrence,* 312 N.W.2d 251, 253 (Minn.1981) (concealing or possessing stolen property is a continuing offense for the purposes of the statute of limitations). In *Fernow* the defendant was charged with theft in violation of the same statute involved here, section 609.52, subd. 2(1). The property stolen was a classic car. The defendant concealed the car for seven years until he brought it to an automobile show, where it was discovered by a friend of the true owner. The court reasoned that the theft was complete when the defendant stopped concealing the car, and the charge, therefore, was not barred by the statute of limitations. *Id.* at 439.

The offense charged here includes both concealing and retaining possession of another's property without consent. Pursuant to *Fernow* and *Lawrence*, we hold counts I and II are not barred by the statute of limitations. We believe the definition of the offense charged, theft by intent to exercise temporary control, supports our conclusion because it implies a continuing offense. That is, the offense continues for as long as the actor possesses the property and intends to exercise control or is exercising control over the property.

## V

O'Hagan was convicted of two counts of theft by temporary control involving the Northrup funds (counts I and II) and six counts of theft by temporary control involving Mayo funds of the Goodman client case (counts VII, IX, XI, XIII, XV, and XVII). He was sentenced separately for each of the eight counts of conviction. O'Hagan argues that he should have received only two sentences, one for the Mayo funds and one for the Northrup funds, because his conduct constituted only one behavioral incident per victim.

■ Minn.Stat. § 609.035 (1986) provides in part:

> [I]f a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of such offenses and a conviction of acquittal of anyone of them is a bar to prosecution for any other of them. All such offenses, if prosecuted, shall be included in one prosecution which shall be stated in separate counts.

The purpose of the statute is to prohibit double punishment

> and at the same time insure that punishment for a single incident of criminal behavior involving a multiplicity of violations is commensurate with the criminality of defendant's misconduct.

*State v. Johnson*, 273 Minn. 394, 399, 141 N.W.2d 517, 521–22 (1966). If section 609.-035 applies, multiple sentencing is prohibited, including the imposition of concurrent sentences. *Langdon v. State*, 375 N.W.2d 474, 476 (Minn.1985). To determine the applicability of section 609.035 in intentional-crime cases, the following elements must be present:

1. The conduct involved must be motivated by a desire to obtain a single criminal objective.
2. The offenses must occur at substantially the same time and place, arise in a continuous and uninterrupted course of conduct and manifest an indivisible state of mind.

*State v. Chidester*, 380 N.W.2d 595, 597 (Minn.App.1986), *pet. for rev. denied* (Minn. Mar. 21, 1986).

■ O'Hagan argues that because the monies were withdrawn from a single corpus of Northrup funds and a single corpus of Mayo funds, his conduct involving these two clients represents only one course of conduct per victim. However, "thefts from the same victim at different times have consistently been found to constitute separate offenses for sentencing purposes." *Chidester*, 380 N.W.2d at 598 (defendant properly received 14 separate sentences for each check he forged and cashed over an eight-month period even though he victimized only one person, his mother); *see also State v. Moore*, 340 N.W.2d 671, 673 (Minn. 1983) (eight counts of aggravated forgery based on separate acts occurring on eight different dates over a three-month period were not part of a single behavioral incident). In this case, the two diversions of Northrup funds occurred approximately seven weeks apart, on January 7, 1987, and on February 27, 1987. The diversion of Mayo funds of the Goodman client case occurred over two and a half months, from December 31, 1987, to March 17, 1988.

O'Hagan also claims he possessed only one criminal objective, to use client funds for his own benefit. This statement of criminal goal is too broad to fall within the protection of section 609.035. *See State v. Eaton*, 292 N.W.2d 260, 267 (Minn.1980) ("one large plan to swindle as much as possible * * * [was] too broad to be a single criminal goal within the meaning of section 609.035 where defendant planned and executed thefts of two different checks at two separate times" only three days

apart). *Cf. Langdon,* 375 N.W.2d at 476–77 (defendant's overall criminal objective "was to steal as much money as he could" from coin-operated washers and dryers located within one apartment complex; the objective would be achieved over the course of one afternoon; court held that the offenses were unitary and multiple sentences were barred by section 609.035). We perceive no error in sentencing O'Hagan on all eight counts upon which he was found guilty.

## VI

The chart below represents the presumptive sentences under the Minnesota Sentencing Guidelines for each count of conviction and the sentences actually imposed thereon by the trial court.

| COUNT | | PRESUMPTIVE SENTENCE | SENTENCE IMPOSED |
|---|---|---|---|
| I. | (Northrup King) | 12 months and 1 day stayed | 24 months executed |
| II. | ( " " ) | 13 months stayed | 26 months executed |
| VII. | (Mayo Foundation) | 15 months stayed | 30 months executed |
| IX. | ( " " ) | 17 months stayed | 30 months executed |
| XI. | ( " " ) | 19 months executed | 30 months executed |
| XIII. | ( " " ) | 22 months executed | 30 months executed |
| XV. | ( " " ) | 25 months executed | 30 months executed |
| XVII. | ( " " ) | 25 months executed | 30 months executed |

The sentences are to be served concurrently. In addition, all eight sentences include an executed fine of $20,000. We find no error in the sentences imposed.

### Durational Departure

 The trial court has discretion to depart from the sentencing guidelines when substantial and compelling circumstances are present. *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981). "If the record supports findings that substantial and compelling circumstances exist," a reviewing court will not interfere with the trial court's discretion "unless it has a 'strong feeling' that the sentence is disproportionate to the offense." *State v. Anderson,* 356 N.W.2d 453, 454 (Minn.App.1984) (quoting *State v. Schantzen,* 308 N.W.2d 484, 487 (Minn.1981)).

The guidelines provide a nonexclusive list of aggravating factors justifying an upward durational departure. Included on the list is the commission of a major economic offense:

(4) The offense was a major economic offense, identified as an illegal act or series of illegal acts committed by other than physical means and by concealment or guile to obtain money or property * * *. *The presence of two or more of the circumstances listed below are aggravating factors with respect to the offense:*

(a) the offense involved multiple victims or multiple incidents per victim;

(b) the offense involved an attempt or actual monetary loss substantially greater than the minimum loss specified in the statutes;

(c) the offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;

(d) the defendant used his * * * position or status to facilitate the commission of the offense, including positions of trust, confidence, or fiduciary relationships; or

(e) the defendant has been involved in other conduct similar to the current offense as evidenced by the findings of civil or administrative law proceedings or the imposition of professional sanctions.

Minn.Sent.Guidelines II.D.2.b. (emphasis added).

■ The trial court properly found that O'Hagan's conduct constitutes a "major economic offense" and that circumstances (a) through (d), as quoted above, were present to justify the durational departures. We agree. Regarding circumstance (a), there were two victims, Mayo and Northrup, and O'Hagan received separate sentences for each count. Therefore, it would not be fair to consider this fact as justifying a departure. However, there were multiple incidents per victim. Therefore, circumstance (a) is present. Regarding circumstance (b), the amount of money involved in the thefts is far greater than the minimum loss of $2,500, a required element of the offense. *See* Minn.Stat. § 609.52, subds. 2(1), 2(5)(a). Circumstance (c) is also present. The segregation of the monies, rather than leaving them in Dorsey's general trust account, gave O'Hagan sole control over and access to the monies. This fact supports the trial court's finding that the thefts were planned by O'Hagan and the use of the funds occurred over several months. Finally, based on his status as an attorney and his status within the law firm, circumstance (d) is present. The durational departures were well justified in this case.

### Dispositional Departure

■ The same aggravating factors may be used to justify both durational and dispositional departures. *State v. Lalli*, 338 N.W.2d 419, 421 (Minn.1983). This court is "loath to interfere" with a dispositional departure absent an abuse of discretion by the trial court. *State v. Case*, 350 N.W.2d 473, 476 (Minn.App.1984).

■ O'Hagan argues that, because he appears amenable to probation, the trial court's decision to depart dispositionally was not justified. Although unamenability to probation is often cited as the justification supporting a dispositional departure, the fact that his conduct is more serious than that usually associated with theft by temporary control is sufficient to justify a dispositional departure. *See State v. Schenk*, 427 N.W.2d 12, 14 (Minn.App.1988) (defendant held herself out as a reputable antique dealer in order to conduct a sophis-

ticated fencing operation over an extended period of time) (citing *State v. Hagen*, 361 N.W.2d 407, 414 (Minn.App 1985)), *pet. for rev. denied* (Minn. April 18, 1985) (dispositional departure justified by the defendant's long-term, sophisticated planning of arson); *Lalli*, 338 N.W.2d at 419 (defendant's conduct was aggravated by the fact he used his position as supervisor to commit economic crime); *State v. Finbraaten*, 363 N.W.2d 473, 475 (Minn.App.1985) (dispositional departure was justified where loss was substantially greater than the statutory minimum, considerable planning was required and defendant exploited his position of trust as handyman to a 97-year-old woman).

Applying the same factors on which the durational departures were based, and because O'Hagan's conduct was far more serious than that usually associated with the crime of theft by temporary taking, the dispositional departures were justified.

### DECISION

We affirm appellant's convictions and the sentences imposed.

Affirmed.