**STATE of Minnesota, Appellant (C8–96–1637), Respondent (C0–96–1650),**

v.

**Stephen (NMN) DANFORTH, Respondent (C8–96–1637), Appellant (C0–96–1650).**

Nos. C8–96–1637, C0–96–1650.

Court of Appeals of Minnesota.

Dec. 16, 1997.

Review Denied Feb. 19, 1998.

John M. Stuart, State Public Defender, Lyonel F. Norris, Assistant State Public Defender, Minneapolis, for appellant/respondent Danforth.

Hubert H. Humphrey, III, Attorney General, St. Paul, for appellant State of Minnesota.

Michael O. Freeman, Hennepin County Attorney, Paul R. Scoggin, Assistant County Attorney, Minneapolis, for respondent/appellant State of Minnesota.

Considered and decided by HUSPENI, P.J., and KLAPHAKE and HARTEN, JJ.

## OPINION

HARTEN, Judge.

Stephen Danforth was convicted of first-degree criminal sexual conduct for sexually abusing J.S., a six-year-old boy. Danforth appealed his conviction and the state appealed the sentence; the appeals were consolidated.

Danforth asserts that irregularities during jury deliberations deprived him of a fair trial. Danforth also argues that the district court erred in admitting a videotaped interview of J.S., after finding J.S. incompetent to testify at trial, because the videotape constituted hearsay that violated his right to confrontation. Finally, Danforth claims that the district court erred in failing to instruct the jury that J.S. had been found incompetent to testify and by disallowing the parties to mention that finding.

The state argues that the district court erred by departing from statutory mandates in implementing Minn.Stat. § 609.1352 (1996) in that it failed to sentence Danforth to an executed term of imprisonment of not less than double the presumptive sentence.

We affirm Danforth's conviction, but reverse in part and remand for resentencing in accordance with Minn.Stat. § 609.1352 and this opinion.

## FACTS

Danforth is a multiply-convicted pedophile with an extensive history of sexually abusing young boys during the 1970's and 1980's. Danforth and J.S.' parents, particularly J.S.' father, were close friends for many years; Danforth was like a "favorite uncle" to J.S. and his siblings, having spent a great deal of time with the family.

On August 11, 1995, a neighbor discovered six-year-old J.S. with his pants down atop a younger girl, acting in a sexual manner. When confronted by his mother and asked where he had learned such things, J.S. said that "Steve" had put his mouth on J.S.' "pee-pee" and his finger in J.S.' "poopie butt." That evening, J.S.' mother called the police to report the alleged sexual abuse.

When interviewed by the police, J.S. said that "Steve" had put his "pee" in his buttocks and that "Steve" had made him "kiss his pee." On August 23, 1995, J.S. was interviewed at CornerHouse, a non-profit sexual abuse center. J.S. gave substantially similar information during this videotaped interview and clearly indicated that he had been sexually abused by Danforth. Danforth was then arrested and charged with first degree criminal sexual conduct.

The trial was lengthy, lasting from February 7 through March 6, 1996. Danforth, a disbarred attorney, represented himself for much of the trial, although he had access to stand-by counsel.

On the day that testimony was scheduled to begin, a competency hearing was held to determine whether J.S. and his five-year-old sister, A.S., were competent to testify. Danforth strongly urged the district court to find J.S. incompetent and to rule the Corner-House videotape inadmissible. The state agreed that J.S. appeared incompetent to testify, but argued that the videotape was nevertheless admissible. Because J.S. had limited ability to focus on questions and give relevant answers, the district court declared him incompetent. The district court found A.S. competent to testify, however, because she exhibited a far superior ability to concentrate than J.S.

The district court admitted the videotape because it found that the taped conversations bore sufficient indicia of reliability. Among other factors, the district court noted that J.S.' remarks appeared spontaneous and largely unsolicited by leading questions, and that J.S. lacked any apparent motivation to fabricate the accusation.

At trial, the jury viewed the CornerHouse videotape, and A.S. testified that she had seen "Steve" put his mouth on J.S.' "pee-pee" and "private" one day in the men's room by the pool at their aunt's apartment. A.S. did not identify Danforth in the courtroom, however. The state called former victims to testify about the sexual abuse underlying some of Danforth's previous convictions.

Danforth testified on his own behalf. He claimed that J.S.' parents trumped up the charges because J.S.' father was repulsed by Danforth's admitted homosexuality and J.S.' mother was angry with Danforth for various disparaging comments and criticism of her parenting skills. Danforth also claimed that he was reformed and understood the evil of his past ways.

The jury convicted Danforth of first-degree criminal sexual conduct. The district court denied Danforth's detailed motion for a new trial and sentenced him to an executed term of imprisonment of 216 months, an upward durational departure of 58 months, but less than double the presumptive sentence, which the state asserted was the minimum sentence required under Minn.Stat. § 609.1352 (the patterned sex offender statute).

## ISSUES

1. Did irregularities in the jury deliberation process deprive Danforth of a fair trial?

2. Did the district court err in admitting the CornerHouse videotape?

3. Did the district court err by refusing to instruct the jury that J.S. had been found incompetent to testify and by prohibiting the parties from mentioning that finding to the jury?

4. Did the district court err in implementing Danforth's sentence as a patterned sex offender under Minn.Stat. § 609.1352?

## ANALYSIS

### 1. Jury deliberation process.

#### a. Judge's contact with jury.

■ Danforth argues that the district court committed reversible error by addressing the jury outside his and counsels' presence and in forcing the jury to deliberate until they reached a verdict.

■ Contact between the judge and jury without notice to the parties is generally considered error, but will be grounds for reversal only if appellant shows that the contact was prejudicial. *State v. Kelley*, 517 N.W.2d 905, 908 (Minn.1994). Contact between the judge and jury on matters not substantively relating to the case (such as matters relating to physical comfort and the like), however, is not necessarily error and is left to the sound discretion of the district court. *Id.* at 908–09.

Only hours into jury deliberations, following weeks of trial, juror L sent a note to the district court, complaining about the lack of air flow in the jury room and claiming that the jury was "hopelessly deadlocked." Despite the juror's premature conclusion that the jury was deadlocked, the district court gave the note serious attention and called the parties to the courtroom to discuss what response should be given. The parties, including Danforth, agreed that one of the jury instructions should be reread to the jury and that they should be sent back for further deliberations.

Later that same day, the bailiff informed the district court that tensions in the jury room were running high and that he believed violence could be imminent. The bailiff also said that one of the jurors, juror H, was threatening to leave. Because it had taken over 45 minutes to convene the parties following juror L's note, the district court spoke with juror H and then the entire jury without first notifying counsel or Danforth.

The district court's remarks to juror H and the rest of the jury were on the record and were limited to matters necessary to enable the jury to continue deliberating. Far from coercing the jury to deliberate until they reached a verdict, the district court attempt-ed to correct some jurors' misimpression that they were not allowed to become a hung jury and reassured them that it was only asking them to deliberate until the next day. The district court's remarks were merely a *request* for cooperation, diligence, and goodwill and an assurance that the jurors were still free to do as they wished.

In *Kelley*, the Minnesota Supreme Court cited the A.B.A. Standard Relating to Trial by Jury 15–4.4(b) (1986) with approval:

> "If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in paragraph (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals."

The commentary to Standard 15–4.4(b) states that:

> [A] court may send the jury back for additional deliberations even though the jury has indicated once, twice, or several times that it cannot agree or even after jurors have requested that they be discharged. * * * [A] jury should not be permitted to avoid a reasonable period of deliberation merely by repeated indications that it is unable to agree.
>
> Instead, the real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals, or was threatened with the prospect of such unreasonably lengthy deliberations. The general rule is that the length of time a jury may be kept deliberating is a matter within the discretion of the trial judge, but abuse of that discretion requires reversal. The reasonableness of the deliberation period depends on such factors as the length of the trial, the nature or complexity of the case, the volume and nature of the evidence, the presence of multiple counts or multiple defendants, and the jurors' statements to the court concerning the probability of agreement.

*Kelley*, 517 N.W.2d at 909. We conclude that under the circumstances the district court did not abuse its discretion by encouraging

the jury to work together for a few more hours to try to reach a verdict.

■ Danforth takes exception to his not being informed until the next morning of the rising tensions and the measures taken to diffuse them. Although it might have been more prudent to notify counsel and Danforth immediately of the further difficulties, the situation needed direct attention, and the parties probably could not have been reassembled quickly enough to avert substantial upset to the process.[1] Furthermore, Danforth shows no apparent prejudice from not being informed of the situation until morning; the jury went to dinner after meeting with the judge and did not continue its deliberations until the next morning.

We conclude that the district court's handling of the volatile situation was within its discretion and commendable under the circumstances.

### b. Atmosphere of violence.

■ Danforth claims that an atmosphere of violence so pervaded the jury deliberation process that some jurors were coerced into their verdict. Although the bailiff warned the judge of the situation because he felt that violence could erupt, the bailiff appears to have been taking reasonable precautionary measures to ensure that the situation was contained before it got out of hand. The record indicates that many jurors felt strongly about the case and that tempers were short, but it does not support Danforth's contention that juror H actually threatened other jurors with violence.

Immediately after receiving the verdict, the district court asked each juror whether the tensions during deliberations influenced their verdict, and all jurors indicated that they had not been unduly influenced. Although the level of tension among jurors was less than ideal, there is no evidence that it rose to a level that prejudiced Danforth.

### c. Jury's review of audiotape not admitted into evidence.

■ By agreement of the parties, a transcript (instead of the audiotape) of police interrogation of Danforth was admitted at trial with certain portions relating to possible abuse of A.S. redacted. During deliberations, however, the jury inadvertently listened briefly to the audiotape before realizing that they were not supposed to have the tape.[2]

After this inadvertence was brought to his attention, the district court inquired of counsel and the parties what to do. The parties together crafted a curative instruction to be read to the jury, which Danforth and his counsel both specifically agreed would be adequate. Only later, *after* the jury announced its guilty verdict, did Danforth request a mistrial based on the jury's exposure to the redacted statements. Accordingly, Danforth waived his right to seek reversal based on any prejudice that might have been caused by the jury's accidental exposure to the audiotape. *See State v. Fields,* 529 N.W.2d 353, 356–57 (Minn.App.1995) (defendant's failure to move for mistrial before verdict precluded him from raising claim that incident in courtroom involving victim's father warranted new trial), *review denied* (Minn. Apr. 27, 1995); *State v. Yant,* 376 N.W.2d 487, 490–91 (Minn.App.1985) (defendant waived right to object to sleeping jurors, where he was apprised of matter during trial and elected not to move for mistrial or request alternate seating before verdict), *review denied* (Minn. Jan. 17, 1986).

Nevertheless, to address the possibility of prejudice, the district court wisely conducted a *Schwartz* hearing after the verdict, and each of the jurors stated that listening to the audiotape had no impact upon his or her verdict.

In sum, we find no abuse of discretion or prejudicial error in the district court's han-

---

1. In his pro se reply brief at 7, Danforth himself recognizes that it "is very probably in this case * * * that but for the trial judge's intervention, Juror [H] would have made good on his threat to leave the jury."

2. The jury apparently heard the following redacted statements:

Investigator: Okay. Okay, how about [A.S.]? [A.S] also during the interview said that there had been some inappropriate touching of her sexual—on her genitals, her sexual area.
Danforth: Oh, no, no, no, no, never, not for either of them.

dling of the irregularities in the jury deliberation process.

### 2. Admission of CornerHouse videotape.

 Appellate courts largely defer to the district court's exercise of discretion in evidentiary matters and will not lightly overturn a district court's evidentiary ruling. *State v. Goldenstein,* 505 N.W.2d 332, 340 (Minn.App.1993), *review denied* (Minn. Oct. 19, 1993). If the admission of evidence violated a constitutional right, however, a new trial is required unless the state can show beyond a reasonable doubt that the error was harmless. *State v. Scott,* 501 N.W.2d 608, 619 (Minn.1993).

 The district court admitted the CornerHouse videotape in accordance with Minn. Stat. § 595.02, subd. 3:

An out-of-court statement made by a child under the age of ten years * * * alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child * * * not otherwise admissible by statute or rule of evidence, is admissible as substantive evidence if:

(a) the court or person authorized to receive evidence finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and

(b) the child * * * either:

(i) testifies at the proceedings; or

(ii) is unavailable as a witness and there is corroborative evidence of the act; and

(c) the proponent of the statement notifies the adverse party of the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceeding at which the proponent intends to offer the statement into evidence to provide the adverse party with a fair opportunity to prepare to meet the statement.

For purposes of this subdivision, an out-of-court statement includes video, audio, or other recorded statements. An unavailable witness includes an incompetent witness.

In addition, the Minnesota Supreme Court has held that recorded interviews of child sexual abuse victims must be shown to bear the "particularized guarantees of trustworthiness" required under *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). *Scott,* 501 N.W.2d at 616. This requirement is essentially incorporated in subdivision 3(a) of Minn.Stat. § 595.02, but the supreme court has listed various non-exclusive factors that bear on the reliability of the hearsay statements, including: spontaneity and consistent repetition, mental state of declarant, use of terminology unexpected of a child of a similar age, lack of motive to fabricate, suggestiveness of prior questioning or leading questions during interview, preconceptions during the interview of what the child should say, and whether the statements are the type of statements one would expect a child of that age to fabricate. *Scott,* 501 N.W.2d at 617 (citing *Idaho v. Wright,* 497 U.S. at 821, 110 S.Ct. at 3150 and *State v. Lanam,* 459 N.W.2d 656, 661 (Minn.1990)).

Given J.S.' strong and substantially consistent statements regarding the abuse, his attention-deficit problems (which render him relatively impervious to suggestion and coaching), his apparent lack of motive to fabricate an allegation harming an avuncular figure, and the professionalism of the CornerHouse interview, we agree with the district court that the videotape was sufficiently reliable to be admitted into evidence.

 We further conclude that there was sufficient corroborating evidence to admit the videotape, as required under Minn.Stat. § 595.02, subd. 3(b)(ii). A.S. had previously stated that she had seen Danforth sexually abuse J.S. The fact that A.S. did not identify Danforth at trial does not negate all corroborating value of her statements. There are many possible explanations why A.S. might not have been able to identify Danforth in the courtroom. Aside from the facts that Danforth had lost weight and it had been a long time in a child's timeframe since she had last seen him, the record suggests that A.S. simply may have been confused by the courtroom identification process.

Danforth also argues that the videotape's admission is particularly objectionable because the district court erred in finding J.S. incompetent to testify at trial. But Danforth strongly urged the district court to find J.S. incompetent to testify, thereby waiving his right to challenge the incompetency ruling on appeal. *Yant*, 376 N.W.2d at 490–91. Here, as in *Yant*, "the trial judge was eminently fair, and looked to the attorneys for some direction." *Id.* at 491. Danforth made a tactical trial decision to urge a finding of incompetence, possibly hoping that both J.S.' testimony and the videotape would be excluded. But both were not excluded, and Danforth now must live with that.

Danforth finally argues that the incompetency finding rendered the Corner-House videotape unworthy of belief. Far from finding J.S. untruthful and lacking the ability to remember anything relevant to the allegations, the district court thoughtfully opined that J.S. had an ability to know and remember the truth, but that J.S. was not capable of paying attention long enough to communicate meaningfully to the jury in a trial setting. We conclude that Danforth's argument is without merit.

### 3. Finding of incompetency withheld from jury.

Danforth argues that the district court deprived him of the right to present a complete defense by refusing to instruct the jury that it had found J.S. incompetent to testify and prohibiting either party from mentioning that finding to the jury. The jury was simply informed that J.S. was "unavailable" to testify.

The district court had discretion in fashioning an appropriate response to both parties' requests for a jury instruction regarding the incompetency finding. *See State v. O'Hagan*, 474 N.W.2d 613, 620 (Minn.App.1991) ("Refusal to give a proposed jury instruction lies within the discretion of the trial court and there is no error absent

an abuse of discretion."), *review denied* (Minn. Sept. 25, 1991).

The district court understood that its finding of incompetency did not necessarily mean that J.S.' testimony was incredible. The district court was concerned that instructing the jury that it had found J.S. incompetent might mislead the jury or cause the jury to conclude that J.S. was too frightened by Danforth to testify. And the jury could interpret such an instruction to reflect the district court's opinion of J.S.' credibility. The district court decided simply to instruct the jury that J.S. was unavailable and to prohibit the parties from mentioning the incompetency finding.[3] We cannot say that such a decision was an abuse of discretion.

### 4. Sentencing Danforth as "patterned sex offender."

The state argues that because the district court found that Danforth met the requisite three prongs to be sentenced as a patterned sex offender under Minn.Stat. § 609.1352, subd. 1(a), the district court was obliged to impose a sentence of at least double the presumptive sentence. Minn.Stat. § 609.1352, subd. 1, provides:

Sentencing authority. (a) A court shall[4] commit a person to the commissioner of corrections for a period of time that is not less than double the presumptive sentence under the sentencing guidelines and not more than the statutory maximum * * * if:

(1) the court is imposing an executed sentence, based on a sentencing guidelines presumptive imprisonment sentence or a dispositional departure for aggravating circumstances or a mandatory minimum sentence, on a person convicted of committing or attempting to commit a violation of section 609.342 * * *;

(2) the court finds that the offender is a danger to public safety; and

(3) the court finds that the offender needs long-term treatment or supervision beyond the presumptive term of imprison-

---

**3.** Danforth nevertheless mentioned the incompetency finding in the presence of the jury in one of his questions during cross-examination of a witness.

**4.** The legislature replaced *may* with *shall* in 1992.

ment and supervised release. The finding must be based on a professional assessment by an examiner experienced in evaluating sex offenders that concludes that the offender is a patterned sex offender. The assessment must contain the facts upon which the conclusion is based, with reference to the offense history of the offender or the severity of the current offense, the social history of the offender, and the results of an examination of the offender's mental status unless the offender refuses to be examined. The conclusion may not be based on testing alone. A patterned sex offender is one whose criminal sexual behavior is so engrained that the risk of reoffending is great without intensive psychotherapeutic intervention or other long-term controls.

(b) The court shall consider imposing a sentence under this section whenever a person is convicted of violating section 609.342 or 609.343.

(Footnote added).

■ The district court believed that even if it found all three prongs necessary to sentence Danforth as a patterned sex offender under subdivision 1(a), it still had discretion whether to impose the "not less than double the presumptive sentence" required by the statute. The statute states in plain language, however, that a court *shall* sentence a defendant to not less than double the presumptive sentence *if* the court finds that the three patterned sex offender prongs are met. Thus, a court does not have the discretion to withhold imposition of a double departure (but not more than the statutory maximum) once it finds that the three prongs have been met.

■ Subdivision 1(b) states that the court "shall consider" imposing the enhanced sentence for patterned sex offenders whenever a person is convicted under section 609.342 or 609.343. Because sections 609.342 and 609.343 (first-and second-degree criminal

sexual conduct) are the most serious levels of sexual offenses, these offenses are singled out in subdivision 1(b) to require courts to *consider* imposing the enhanced sentence under the statute whenever a person is convicted of one of these crimes, even on a first offense. The other crimes listed in the statute are either lesser sexual crimes or other "predatory crimes" that do not necessarily involve sexual motivation. Thus, in harmonizing any purported conflict between subdivision 1(b) and subdivision 1(a), we conclude that subdivision 1(b) does not negate the mandatory nature of the sentencing provisions under subdivision 1(a) provided the court finds that the three patterned sex offender prongs have been met.

■ When a person is convicted under section 609.342 or 609.343, the court must consider whether the three prongs under Minn.Stat. § 609.1352, subd. 1(a), are met. If it decides that they are met, it must impose not less than double the presumptive sentence for the crime, not to exceed in any case the statutory maximum.[5] The court must then also impose a conditional release term of ten years or the remainder of the statutory maximum period, whichever is longer. Minn.Stat. § 609.1352, subd. 5. The court may not, however, impose the extended conditional release period under subdivision 5 without having invoked the enhanced sentencing provisions for patterned sex offenders under subdivision 1(a), as it did in this case. In other words, a court may not use subdivision 5 independently of subdivision 1(a).

■ We are particularly concerned with the district court's stated reliance on potential future civil commitment as a sexually dangerous person in sentencing Danforth. Because incapacitation alone is not a constitutionally permissible ground for civil commitment without a diagnosed mental disorder

---

5. Minn.Stat. § 609.1352, subd. 4, which states that a "sentence imposed under subdivision 1 is a departure from the sentencing guidelines" gives no additional discretion to the district court in sentencing as a patterned sex offender. It merely acknowledges that the enhanced sentences under subdivision 1 are guideline departures; it also eliminates possible arguments that the guidelines were still meant to control for the crimes underlying sentencing as a patterned sex offender and that additional aggravating factors other than those implicit in a patterned sex offender finding are necessary for the enhanced sentence.

coupled with a legitimate attempt to treat it,[6] use of the civil commitment process is not to be anticipated or invited as a substitute for criminal incarceration to incapacitate chronic sex offenders.

Whenever a court sentences a defendant as a patterned sex offender, it has necessarily found that the defendant is a danger to public safety and needs long-term treatment or supervision beyond the presumptive term of imprisonment and supervised release. Minn.Stat. § 609.1352, subd. 1(a)(2), (3). The legislature has decided that anyone meeting such criteria warrants lengthy incarceration.

Accordingly, we reverse in part and remand for resentencing consistent with Minn. Stat. § 609.1352 and this opinion.

We have painstakingly considered each of Danforth's numerous additional arguments presented in his pro se brief (some of which relate to the main claims addressed in this opinion) and find them to be without merit.

### DECISION

Irregularities in the jury deliberation process did not deprive Danforth of a fair trial or involve district court abuse of discretion. The district court did not err in admitting a videotape interview of the victim or in refusing to instruct the jury or allow comment on the fact that the victim was found incompetent. The district court properly entered judgment convicting Danforth of first-degree criminal sexual conduct, but improperly applied Minn.Stat. § 609.1352 in sentencing, thereby requiring a remand for resentencing.

**Affirmed in part, reversed in part, and remanded.**

6. *See In re Blodgett,* 510 N.W.2d 910 (Minn.1994) (discussing constitutionality of psychopathic personality commitment statute).