**STATE of Minnesota, Respondent,**

v.

**Richard Galen SCOTT, Petitioner, Appellant.**

No. C0-91-2102.

Supreme Court of Minnesota.

June 11, 1993.

John M. Stuart, State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., Robert Stanich Asst. Atty. Gen., St. Paul, Robert Tiffany, Redwood County Atty., Redwood Falls, for respondent.

TOMLJANOVICH, Justice.

Appellant, Richard Scott, was convicted of eight separate charges of sexual misconduct involving two female children, H.S., his daughter, and A.B., who attended a daycare service run by his wife. At the time of trial, H.S. was nine; A.B. was six. After holding competency hearings, the trial judge ruled that A.B. was competent to testify but that H.S. was not. In lieu of H.S.'s live testimony, the judge admitted an audiotape of an interview with H.S. conducted by a deputy sheriff and a social worker.

This appeal presents two issues. First, we are asked to revisit our decisions regarding the inquiries trial courts may make when determining whether children are competent to testify in trials. We also must decide whether an audiotape of a statement a child complainant made to a police officer and a social worker was properly admitted into evidence pursuant to the standards set forth by the United States Supreme Court in *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). We believe the trial court erroneously inquired into the core of the child's anticipated testimony. The trial court based the finding that the child was incompetent on the answers to these questions and strayed from the standards the legislature and this court have set forth for determining competency of child witnesses. We also believe that the audiotape did not have the indicia of reliability necessary in order for its admission into evidence to comport with the requirements of the Confrontation Clause of the Sixth Amendment of the United States Constitution. Because these errors were only harmful as to some of the convictions, we, however, affirm in part and reverse and remand in part.

Appellant Scott's wife runs a daycare service. When A.B., a child who attended the daycare service, was picked up by her mother on Friday, April 12, 1991, she told her mother that Scott had touched her improperly while his wife was running errands. A.B. later testified that she had been coloring when Scott had picked her up and put her on his lap. He then pulled a tablecloth over their laps and stuck his finger down her pants. A.B. told her mother that he touched her with one finger, which he put inside her and that this had hurt. She also told her mother that Scott had kissed her; she also testified that this kiss was "different" from the kisses her parents gave her. She also testified that Scott had touched her in a similar fashion previously. A.B. also told her mother that when H.S., the Scotts' nine-year-old daughter, arrived home from school, she told her what had happened. A.B. reported that H.S. told her that her father had done this to her too.

That evening, A.B.'s parents called a school counselor, who said he would contact the necessary authorities. On Monday morning, the Human Services Department contacted the sheriff's office about the incident and assigned a deputy to the case. He went to A.B.'s school and spoke to A.B.'s mother, who was employed there. At the deputy's request, A.B. and her mother went with the deputy to the law enforcement center, and he interviewed A.B. on videotape.

At about 2:30 Monday afternoon, Scott's wife called the deputy and made a report as required by the Child Abuse Reporting Act, Minn.Stat. § 626.556 (1990). Following an interview with the deputy, and a discussion with a representative of the Human Services Department, arrangements were made to interview H.S. This interview took place that evening at the Scotts' home. It was primarily conducted by the deputy; the human services representative asked a few questions. H.S.'s mother was present; Scott was not present because he was traveling for work.

Before turning on the tape recorder, the deputy talked with H.S. about general matters and asked some questions about her father. He continued by asking her several questions about the subject matter of the allegations.[1]

1. The deputy taped the final part of this interview, the essential portion reads as follows:

Q. [T]he front you call the private part, right? Is that right? You're nodding your head yes. All right. Has anyone touched you in your private parts?
A. Yes.
Q. Who was that?
A. Dad.
Q. How many times has he touched you?
A. I don't—I don't remember
Q. When was the last time he touched you?
A. Umm, like—
Q. Last weekend when he was home?
A. A couple days before that.
A. Would this have been last week, do you think?
A. I think so.
Q. He touched you on your private parts?
A. Uh-huh.
Q. Where was everybody at when that happened?
A. In the livingroom.
Q. Where were you at, in your room, or out on the street, or—?
A. I don't know. I think it was downstairs.
Q. Downstairs, does that mean this room?
A. No, in there.
Q. In the room where we were just sitting in with, where the tv is and the couch is?
A. Uh-huh.

\* \* \* \* \* \*

Q. What did he touch you with?
A. His hand.
Q. Okay. What part of his hand?
A. His right hand.
Q. Can you point to what part of him touched you on your private parts. Was it his thumb, his finger, a couple fingers? A couple fingers? Okay. Did he touch you on the top of your clothes?
A. No.
Q. Were you wearing clothes at the time?
A. Yeah.
Q. Were you wearing clothes like you are now or did you have your pajamas on?
A. I had my school clothes on already.
Q. Okay. Getting ready to go to school?
A. No, I still had my school clothes on and I was going to go change and I didn't change yet, and I had to get something down here.
Q. Okay. And you said he touched you underneath you clothes? Is that what you said? You're nodding your head yes. Okay. And he touched you with his right hand?
A. Yes.
Q. And where did he touch you at?
A. My private parts.
Q. Okay. With his fingers. What did he do when he stuck his hand on your private parts?
A. I can't remember.

Q. Okay. Let me ask you this then. Did he move his hand around at all?
A. No.
Q. Did he put his finger or his hand inside you at all?
A. No.
Q. Did it hurt when he did that?
A. Yeah.
Q. Where did it hurt, [H]?
A. I don't know.
Q. Would it be where you go to the bathroom then?
A. Yes.
Q. Yes. Okay. Has he ever done that to you before?
A. No, not really.
Q. Not really? Okay. Is that kind of a yes or a no there? You kind of told me before that that had happened a lot of times. Now you're nodding your head yes.
A. Yes.
Q. Okay. Does that happen a lot where he sticks his hand inside your pants?
A. Yes.
Q. Yes? Does it happen when you're here at home alone with him or—
A. Sometimes.
Q. Okay. Does it happen in your room?
A. No.
Q. Does it ever happen while you're sleeping at night at all?
A. No.
Q. Where does it mostly happen at?
A. I don't know.
Q. In the house?
A. Yeah.
Q. Does he touch you the same way those other times?
A. Yes.
Q. How many times, [H], would you say he's maybe done that to you?
A. About six.
Q. Six times? That many? Six times? Do you remember the first time that happened?
A. Uh-huh.
Q. Has it been a long time ago since it started happening?
A. Yeah.
Q. And was it before school started?
A. Yeah.
Q. Okay. Was it when you were in first grade?
A. I don't remember.
Q. Okay. Has it ever happened last summer when you and he came home from the swimming pool at all?
A. No.
Q. Did it start happening before Christmas?
A. I think so.
Q. You think so? Okay.

\* \* \* \* \* \*

[Break taken]

Upon returning home, on the evening of April 18, 1991, Scott was arrested. He agreed to an interview in a squad car. In the interview, he admitted touching A.B. in the vaginal area the previous Friday. He said he barely recalled the incident, but was sure he had touched her on top of her clothing—not beneath it. He also admitted touching H.S. in the vaginal area, but said it had been a year ago or even longer and that he had not done it many times. He claimed to have stopped after his wife discussed it with him.

During the trial, the court ruled that A.B. was competent to testify but that H.S. was not. The trial judge also ruled that the audiotape would be entered into evidence pursuant to Minn.Stat. § 595.02, subd. 3 (1990).[2]

Scott testified at trial. He admitted that he had touched A.B. in the vaginal area, but denied penetrating A.B. Appellant admitted touching H.S. in a similar fashion, but claimed that this had occurred just

> Q. We're back on tape. [H], six times is what you figured, did it maybe happen more than that?
> A. Huh-huh.
> Q. Six times. Okay. Has he ever touched you on your butt?
> A. No.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Q. * * * [H], has he ever put anything on his hands at all when he touches you?
> A. No.
> Q. Anything at all that you ever seen? When he touches you on your private parts it hurts?
> A. Uh-huh.
> Q. Is that because he is sticking his finger inside of you, [H]?
> A. Yeah.
> Q. (By [the human services representative]) Has there ever been blood?
> A. No.
> Q. (By [the d]eputy) How long does he keep his finger inside of you, [H]?
> A. I don't know.
> Q. Does he move it around then?
> A. No.

**2.** The relevant portions of the statute provide:

> An out-of-court statement made by a child under the age of ten years * * * alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child * * * not otherwise admissible by statute or rule of evidence is admissible as substantive evidence if:

once, more than two or three years previously. Appellant stated that he was admitting to one instance of second-degree criminal sexual conduct with each girl, specifically denying that he had touched the girls beneath their clothes or otherwise penetrated them. He explained his admission by saying that he only wanted to be found guilty of what he had done, not what he had not done. In closing argument, his counsel emphasized that defendant had committed one incident of second degree sexual misconduct with each child. The jury found defendant guilty of several counts of criminal sexual conduct.[3]

Scott appealed to the Court of Appeals. In an unpublished opinion filed on July 28, 1992, the Court of Appeals ruled there was insufficient evidence to support the two convictions for solicitation of children to engage in sexual conduct. The court also reversed three of Scott's convictions as to H.S., affirming one conviction for first de-

> (a) the court * * * finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and
> (b) the child * * *
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (ii) is unavailable as a witness and there is corroborative evidence of the act * * *.
>
> In addition, hearsay evidence in child sexual abuse cases will sometimes be admissible pursuant to the residual exception to the hearsay rule, Minn.R.Evid. 803(24). *See State v. Edwards,* 485 N.W.2d 911 (Minn.1992). Because the challenge here is on Confrontation Clause grounds, it is not critical which reason the trial court used for admission of the testimony.

**3.** As to A.B., the jury convicted Scott of one charge of second degree criminal sexual conduct in violation of Minn.Stat. § 609.343, subd. 1(a) (1990) and one charge of solicitation of a minor in violation of Minn.Stat. § 609.352 (1990).

As to H.S., the jury convicted Scott of two charges of first degree criminal sexual conduct in violation of Minn.Stat. § 609.342, subd. 1(a) (1990) and Minn.Stat. § 609.342, subd. 1(g) (1990), three charges of second degree criminal sexual conduct in violation of Minn.Stat. § 609.-343, subd. 1(a) (1990), Minn.Stat. § 609.343, subd. 1(g) (1990), and Minn.Stat. § 609.343, subd. 1(h)(v) (1990), and one charge of solicitation of a minor in violation of Minn.Stat. § 609.352 (1990).

gree and one conviction for second degree sexual criminal misconduct.[4] Scott has appealed to this court only as to the remaining convictions as to H.S.

## I.

■ Competency of children to testify is governed by Minn.Stat. § 595.02, subd. 1(*l*) (1992), which states in part:

> Competency of witnesses. Every person of sufficient understanding, including a party, may testify in any action or proceeding, civil or criminal, in court or before any person who has authority to receive evidence, except as provided in this subdivision:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (*l*) A child under ten years of age is a competent witness unless the court finds that the child lacks the capacity to remember or to relate truthfully facts respecting which the child is examined. A child describing any act or event may use language appropriate for a child of that age.

This statute was enacted in 1987. In that year, the legislature clearly changed course on the issue of the competency of children to testify. Previously Minn.Stat. § 595.02, subd. 1(f), *repealed by* 1987 Minn. Laws, c. 120 § 1, had created a presumption that a child under ten was incompetent to testify. As the new statute makes clear, children are now presumed competent to testify unless the contrary is shown. This court recognized this legislative change of course in *State v. Lanam*, 459 N.W.2d 656 (Minn.1990), and held that in a competency hearing, the task before the trial judge is to test whether the child has the ability to relate events truthfully:

> [The statute] does not mean that the court is to question the child on the details of possible testimony, but rather means that the court should determine in a general way whether the child remembers or can relate events truthfully. The jury will judge the child's credibility and decide the weight to assign the testimony. A competency hearing is not a credibility hearing. Competency concerns the child's ability to be truthful and to understand the importance of telling the truth in court. It also concerns the child's ability to remember and relate events. Whether a child is easily led goes more to credibility than to competency. Even adults at trial become inconsistent upon cross-examination. It is the jury's province to sort out the inconsistencies and determine credibility, the court's province to determine competency. Where the court is in doubt as to the child's competency, it is best to err on the side of determining the child to be competent.

*Lanam*, 459 N.W.2d at 659–60. Thus this court in *Lanam* acknowledged the change in child competency law and acknowledged the presumption that children are competent to testify unless it is shown that they are incompetent.

In this case, the trial judge began H.S.'s competency hearing with the general types of questions clearly sanctioned by *Lanam*. The judge asked H.S. her age, where she attended school, what she was studying in school and what activities she enjoyed during the summer. The judge next asked H.S. questions going to her ability to understand the oath and to testify truthfully. During this examination, H.S. showed an appreciation for an understanding of the difference between a truth and a lie and said, "It's bad to tell a lie," and answered

---

4. The court of appeals reversed the convictions as to H.S. pursuant to Minn.Stat. § 609.343, subds. (1)(a) and (g) as lesser included offenses. It also reversed the conviction pursuant to Minn.Stat. § 609.342, subd. (1)(g), believing it was based on the same conduct as the conviction pursuant to Minn.Stat. § 609.342, subd. (1)(a). The court of appeals reversed the convictions for solicitation because the state conceded that they did not rest on substantial evidence. The court agreed and reversed the con-

victions under Minn.Stat. § 609.352, subd. 2 (1992). The state has not appealed the reversal of these convictions here and we express no opinion as to the propriety of the court of appeals' ruling.

Thus the convictions which remain are those pursuant to Minn.Stat. § 609.342, subd. 1(a) and Minn.Stat. § 609.343, subd. 1(h) as to H.S. and one pursuant to Minn.Stat. § 609.343, subd. 1(a) as to A.B.

yes to the question, "Is it good to tell the truth, do you think?" The transcript indicates that H.S. seemed somewhat baffled by these questions, but demonstrated that she could distinguish between the truth and a lie and had an appreciation for the difference.

■ The judge next asked about the conversation with the deputy. H.S. did not seem to remember the conversations. The judge began this portion of the hearing as follows:

Q. Now, you talked to [the social services worker], and a deputy, and a sheriff's officer, about your dad, didn't you, do you remember that?

A. Yes.

Q. Did you talk to [the social services worker], and [the deputy] about some touching your dad did?

A. I think so.

At this point in the hearing, it appeared that H.S. did remember the events surrounding the allegations. But the questioning had already gone beyond the guidance set forth by this court in *Lanam:* the judge assumed that a touching occurred, precisely the issue to be decided at the trial. The judge continued:

Q. Do you remember basically what you told them about the touching?

A. I can't remember.

Q. What can you remember about what you told them?

A. I don't know.

Q. Can you remember anything about it? Is that a no or a yes?

A. No.

Q. Do you remember telling them about your dad touching you between your legs?

A. I can't remember.

Q. Do you remember anything about your dad touching you between your legs or in your private parts?

A. I don't know.

The judge also asked her if she remembered telling her mother, her father or the police. She responded that she did not know or did not remember, except that she had not spoken to her dad about it, but thought she had talked to her mom. Shortly thereafter, the judge terminated the competency hearing, ruling as follows:

The court does find that [H.S.] is an unavailable witness. The court finds, and it's the court's belief that the case law supports this. That with regard to the anticipated testimony of [H.S.], and in essence, that is all we're concerned with here, in a trial of this sort. That with regard to the anticipated testimony, the child, [H.], is demonstrably and without a doubt unable to narrate the facts to which that testimony relates.

The court cannot, is not in a position to speculate as to the reasons behind [H.'s] virtual total lack of memory as to these events. We are not just talking here about whether or not the child remembers touching. That is an issue that goes to the heart of this case, and one could presumably forget about those things. But we are also talking about her forgetting speaking with her mother about touching, we are talking about her forgetting completely about speaking with police officers and a welfare worker a few months earlier about the touching.

What we're talking about with [H.] is an across the board memory loss as it relates to anything to do with alleged touching by the defendant by his daughter.

The court asked the question in a number of ways, and from a number of different angles, including, whether or not she spoke with her mother about this issue, and there is evidence in the record that she did speak with her mother about this issue.

The court asked extensively whether or not she remembered talking to [the deputy] and [the social services worker] about it. She could not remember, and yet there is extensive evidence in the record that she in fact did talk to those people.

The court asked her simply the bald question, whether or not her father ever touched her in a private place. And the court asked that in several ways on sev-

eral occasions and despite the fact that there is a statement which has been admitted in evidence in this trial by the defendant himself tending to corroborate or indicate that that touching occurred, the child still cannot remember.

The court has no choice in that case but to declare her incompetent. She is certainly incompetent as to any of the relevant testimony that would be elicited either on direct or cross-examination at this trial.

The trial judge improperly applied *Lanam*. In a competency hearing, a child is not to be questioned about the specifics of the anticipated testimony. In this case, the trial judge did precisely that. H.S.'s responses to these questions were the basis for the trial court's ruling that she was incompetent to testify. Although competency has to do with a witness' ability to "remember and relate" events, the language in *Lanam* strongly suggests that this means the ability to remember and relate events *generally*, not the specific events which lie at the heart of the case.

Thus we believe the trial court erred in this case by probing too far into H.S.'s anticipated testimony. Although H.S. eventually gave responses to a string of questions indicating that she had little recall of the events surrounding the criminal allegations, this memory loss did not become apparent until the trial judge asked questions which went to the core of H.S.'s testimony, precisely the question "Do you remember basically what you told them about the touching?" This question went too far. The trial judge clearly was making an illegitimate assumption about the substance of H.S.'s trial testimony.

▇▇▇ The Supreme Court's opinion in *Kentucky v. Stincer*, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), is also informative. Unlike this case, the question before the Court in *Stincer* was not the proper scope of questions asked in competency hearings. Rather, the issue before the Court was whether the exclusion of the defendant from the competency hearing violated his Sixth Amendment right to con-

front the witnesses against him. In holding that it did not, Justice Blackmun wrote:

> [Q]uestions at a competency hearing usually are limited to matters that are unrelated to the basic issues of the trial. Children often are asked their names, where they go to school, how old they are, whether they know who the judge is, whether they know what a lie is, and whether they know what happens when one tells a lie. See Comment, The Competency Requirement for the Child Victim of Sexual Abuse: Must We Abandon It?, 40 U.Miami L.Rev. 245, 263, and n. 78 (1985); Comment, Defendants' Rights in Child Witness Competency Hearings: Establishing Constitutional Procedures for Sexual Abuse Cases, 69 Minn.L.Rev. 1377, 1381–1383, and nn. 9–11 (1985). [Footnote omitted].

482 U.S. at 741–42, 107 S.Ct. at 2665–66. We believe that these are precisely the types of questions judges should ask when questioning a child to determine competency to testify. We stress that cases in which a child appears to have been determined incompetent because the testimony at the competency hearing did not comport with the criminal allegations or earlier statements of the child will be reviewed very closely by this court. The simple reason is that those cases create the appearance that the trial judge did not determine competency, but rather prejudged the facts and determined the child to be incompetent for not testifying to particular facts. If questions about the subject matter are not asked, this problem will not arise. Thus we recommend that questions not be asked about the subject matter of the case during competency hearings.

We conclude that the incompetency ruling was invalid because it was based upon H.S.'s responses to the improperly asked questions.

## II.

Appellant also challenges the trial court's admission of the audiotape of the interview between the deputy, the human services representative and H.S. into evidence.

■ As a preliminary matter, the state argues that the Confrontation Clause issue was not adequately raised below and is waived on appeal. When the trial judge ruled that he was going to admit the testimony of H.S., defense objected as follows:

Your honor, we would place on the record an objection of the defense to the finding that [the audiotape] shall be admitted as substantive evidence. Defense would dispute the finding that [H.S.] is incompetent. We believe that she's competent to tell the difference between truth and non-truth, and she was qualified to do so on the record. That her memory loss as to the event itself could just as well be due to the fact that it didn't happen, as to anything else.

And therefore the finding that she's incompetent and therefore unavailable, we would object to. We believe that she's competent, and that the memory loss would indicate, could indicate a defense that it didn't happen, as well as any other number of assumptions to account for her memory loss.

That we believe that she's an available witness, and would just place our objections on the record as to the court's findings.

We believe it is clear from the record as a whole that the defense objected to the exclusion of H.S.'s live testimony and the admission of the audiotape. In *State v. Sorenson,* 441 N.W.2d 455 (Minn.1989), this court said: "We may, however, at our discretion, decide to hear such issues when the interests of justice require their consideration and addressing them would not work an unfair surprise on a party." *Id.* at 457. The abundance of discussion in the record as to whether H.S. should testify and whether the audiotape should be admitted indicate that the issues raised by a Confrontation Clause challenge are no surprise and do not work an injustice. Thus we will decide the Confrontation Clause issue, again reminding practitioners that the more specifically they object the more ironclad is the guarantee that an issue will be heard on appeal.

■ The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Statements that do not fall within a firmly rooted hearsay exception are "presumptively unreliable and inadmissible for Confrontation Clause purposes." *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990) (citing *Lee v. U.S.,* 476 U.S. 530 at 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514). In the absence of a showing of particularized guarantees of trustworthiness, the Confrontation Clause requires that these hearsay statements must be excluded from a criminal trial. *Wright,* 497 U.S. at 817, 110 S.Ct. at 3148 (citing *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597).

■ In *Wright,* the Court held that the Confrontation Clause required that an out-of-court statement should only be admitted when the statement contains "particularized guarantees of trustworthiness." 497 U.S. at 817, 110 S.Ct. at 3148. However, the relevant circumstances, for purposes of this inquiry are not the totality of the circumstances and all the corroborating evidence in the case but only "those [circumstances] that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* 497 U.S. at 817, 110 S.Ct. at 3148. The Court based this requirement on the general rationale for permitting exceptions to the hearsay rule:

The theory of the hearsay rule * * * is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation.

*Wright,* 497 U.S. at 819, 110 S.Ct. at 3149 (quoting 5 J.Wigmore, Evidence § 1420, p.

251 (J. Chadbourne rev. 1974)). The court continued:

> [I]n other words, if the declarant's truthfulness is so clear from the surrounding circumstances *that the test of cross-examination would be of marginal utility,* then the hearsay rule does not bar the admission of the statement at trial.

*Id.* (emphasis added). After brief explanations of why several of the exceptions to the hearsay rule are reliable, the Court concluded:

> Thus, unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement.

*Id.* 497 U.S. at 821, 110 S.Ct. at 3150. Thus in *Wright,* the Court held that there was a presumption of unreliability for hearsay statements that may only be overcome by indicators of reliability, based upon the circumstances in which the statement was made and thus dispense with the need or utility of cross-examination.

The Court listed several factors which other courts had considered in determining that a child's hearsay statement in a sexual abuse case was reliable. Among them were spontaneity and consistent repetition, the mental state of the declarant, use of terminology unexpected of a child of a similar age and a lack of a motive to fabricate. The Court noted that these factors were not exclusive, declined to endorse a mechanical test, and emphasized that any test which was used should be designed to determine "whether the child declarant was *particularly likely to be telling the truth* when the statement was made." *Id.* (emphasis added).

This court followed suit. In *State v. Lanam,* 459 N.W.2d 656 (Minn.1990), we set forth the standards a court should use when determining whether it is appropriate to allow extrajudicial hearsay into a criminal trial. The *Lanam* opinion echoed the concerns of the Supreme Court in *Wright.*

After examining the relevant Supreme Court authorities, we explained:

> [S]tatements admissible under a state's residual exception satisfy the confrontation clause reliability requirement only if the state establishes that the totality of the circumstances surrounding the making of the statements show the statements were "sufficiently trustworthy"—that is, that it is "particularly likely" that the declarant was telling the truth at the time of making the statements. [Citation omitted] Stated differently, the focus is not on all of the circumstances, * * * but only on those circumstances actually surrounding the making of the statements. These circumstances include, but are not limited to, whether the statements were spontaneous, whether the person talking with the child had a preconceived idea of what the child should say, whether the statements were in response to leading or suggestive questions, whether the child had any apparent motive to fabricate, and whether the statements are the type of statements one would expect a child of that age to fabricate.

*Id.* at 661. In *Lanam,* we held that the child's statements were reliable. We noted

> S made her initial statement regarding the abuse spontaneously to other children in the foster home. Then, when questioned by her foster mother and others, she consistently described the abuse and said that "David" did it. Details varied, as did statements regarding exactly when the abuse happened, but the basic story remained unchanged. * * * [T]he foster mother * * * had several children of her own, had been a foster mother for 20 years, and had no motive to falsely implicate defendant. When [she] questioned S in a nonleading way, S said "David" [5] had done it and described him as the "David who worked for Pizza Hut," a generic term S used for all pizza places. S also said "David" lived near her house and often sat with her at her mother's house. As we said earlier, S

---

**5.** The accused's first name in *Lanam* was David.

subsequently pointed out defendant's house one day as they drove by it. She also identified defendant as the "David" when she saw him accidentally in the hall at the courthouse on the day of a hearing. Significantly, S had no apparent motive to fabricate. Further, the statements were not the type of statements one would expect a child of S's age to fabricate.

*Lanam,* 459 N.W.2d at 661.

▊▊▊▊ The hearsay in this case differs significantly from that in *Lanam.* The child in *Lanam* made her initial statement spontaneously to other children in a foster home. In this case, the initial statement was in response to a sexual abuse allegation against her father and an inquiry by A.B. In this case, unlike *Lanam,* there has not been a consistent repeating of a the same story. Additionally, in this case, the deputy's questions were asked in a suggestive and sometimes leading way. Further, although the judge found that H.S. did not have a motive to fabricate, there was little evidence about whether H.S. had a motive to fabricate; it seems worth noting that the state bears the burden of proving reliability. The absence of a motive to fabricate standing alone does not mean that a statement is reliable.

Of additional importance, in *Lanam,* the allegations of sexual abuse were more lurid than they were in this case. There were allegations of forced oral sex, which the child described as the appellant having "peed" in her mouth and that afterward she had "spit it out." A 3–year old would not be expected to be familiar with these activities or this language in the absence of abuse. In this case, no allegations have been made in language one would not expect a nine-year-old to know.

Whatever factors are deemed relevant to a trial court when determining whether hearsay is reliable, we believe that this determination must always be made against the background of the general concerns expressed by the Supreme Court in *Wright.* Looking at the totality of the circumstances and all of the factors bearing on reliability, the trial court must arrive at the conclusion that cross-examination would be fruitless as to the hearsay testimony in question. In this case, cross-examination of the declarant as to the contents of the statement would have been a valuable tool. The defendant could have questioned H.S. about the incident and explored any lack of memory about the events surrounding the allegations. In this case there is stronger evidence to suggest that cross-examination would have been more useful than it would have been in *Lanam.*

We have recently addressed the issue of admissibility of hearsay pursuant to Minn. R.Evid. 803(24) in *State v. Edwards,* 485 N.W.2d 911 (Minn.1992). In that case, we needed to decide whether statements made at a hospital shortly after an alleged incident of alleged criminal sexual conduct were admissible:

> A police sergeant went to the hospital an hour or so later, at 1:10 p.m., and, in the examination room, talked with complainant, who said defendant forced her on the bed face down and held her there and took his penis out of his pants through the unzipped fly. She said defendant then got on top of her and started humping up and down trying to get his penis into her butt. She said she could feel it but did not know if it actually entered her.[6] The officer noted in his report, "She appeared very frightened, clinging to the hospital bed saying, 'You have to put him in jail and don't ever let him out.'"

*Edwards,* 485 N.W.2d at 912–13 (footnote by the court). In deciding whether the statements made at the hospital should be admissible, we stated:

> Applying these factors to the circumstances surrounding complainant's statements to the sergeant at the hospital, the state argues that the statements are admissible and the defense argues that they are not. * * * There is no indication that the officer had a preconceived notion of what the child should say or

---

**6.** The complainant mentioned other incidents of     similar conduct.

that the officer was merely trying to get the child to say what the officer wanted to hear. The child had no apparent motive to fabricate. The statements clearly are not the type of statements one would expect a child of that age to fabricate. Further, the statements not only had an immediately apparent "ring of credibility," *see State v. Larson,* 472 N.W.2d [120] at 126, but were internally consistent during the interview.

*Id.* at 916.

Again, these spontaneous statements differ from the statements in this case in several important respects. The deputy's leading questions indicate that he might have had a preconceived idea of what H.S. should say. As noted above, one cannot tell one way or another from the record whether H.S. had a motive to fabricate. As in *Lanam,* the allegations of abuse and the substance of the hearsay statements are not as lurid in this case as in *Edwards,* and one cannot necessarily say that the statements might not be fabricated by a six year old child. It is also important that the statements in *Edwards* were made with a kind of fervor, and consequent "ring of credibility", which is lacking in the statements in this case. The statements were the type for which cross-examination would not have served a readily apparent purpose.

Thus, applying the tests set forth in *Wright, Lanam* and *Edwards,* we hold that the audiotape of the interview is not reliable enough to overcome the presumption that cross-examination of the declarant would be useful. That was not shown in this case and the trial judge erroneously admitted the audiotape into evidence.

### III.

■ Given the errors made in the competency hearing and the erroneous admission of the audiotape, we must decide whether a new trial is warranted. When there is error of a constitutional dimension in a criminal trial, a new trial is required unless the state can show beyond a reasonable doubt that the error was harmless.

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ After the court of appeals' decision, one count of first degree sexual conduct in violation of Minn.Stat. § 609.342, subd. 1(a) and one count of second degree criminal sexual conduct in violation of Minn.Stat. § 609.343, subd. 1(h) remain as to H.S. The appellant admitted second degree criminal sexual conduct as to H.S. in his statement and on the witness stand. We believe that the state has shown beyond a reasonable doubt that the jury would have convicted on the second degree charge even if the evidence admitted in error had been excluded at trial. Because of the double confession, the state has demonstrated that the absence of H.S.'s testimony and the nonadmission of the audiotape would not have affected the second degree conviction. Thus we believe the second degree conviction may stand because the errors at trial were harmless.

The first degree conviction, however, required a finding of sexual penetration. Unlike the second degree charges, appellant did not admit to penetration of H.S. The key evidence of penetration was H.S.'s statement. The state has not shown, as required by *Chapman,* that the statement was not a significant factor in the jury's decision to convict on the first degree count. The error was harmful. We reverse and remand for a new trial on the first degree count pursuant to Minn.Stat. § 609.342, subd. 1(a).

Affirmed in part; reversed and remanded in part.