STATE of Minnesota, Respondent,

v.

Marlow Devette JONES, Appellant.

No. C3–95–1101.

Supreme Court of Minnesota.

Oct. 31, 1996.

Michael F. Cromett, St. Paul, for Appellant.

Hubert H. Humphrey, III, St. Paul, Michael O. Freeman, Hennepin County Attorney, Donna J. Wolfson, Minneapolis, for Respondent.

## OPINION ON REHEARING

GARDEBRING, Justice.

In this case, appellant Marlow Devette Jones, contests his conviction of first-degree murder, Minn.Stat. § 609.185, and attempted first-degree murder, Minn.Stat. § 609.17. The trial court sentenced appellant to life imprisonment for the murder conviction and a concurrent sentence of 180 months for the attempted murder conviction.

Appellant raises four issues on appeal: 1) whether the trial court's decision to admit a stipulated summary of a co-defendant's statements was error requiring a new trial; 2)

whether the trial court's jury instructions, including directions to keep deliberating on two occasions, constituted an abuse of discretion; 3) whether a suggestive pretrial identification procedure so prejudiced the trial as to warrant a new one; and 4) whether the evidence was sufficient to support the conviction.

Appellant, who is also known as "Levi," lived periodically in a Minneapolis house located at 2817 Bryant Avenue North. The victims, Tavarian McDonald and Darren McKnight, sold crack cocaine from the house. According to testimony at trial, on January 9, 1993, appellant and co-defendant Jamie Pearson, entered the home, located McDonald and McKnight in the kitchen and pointed handguns at them. Pearson then moved through the house, directing others in the home, including Earline Donaldson (who apparently owned or rented the home), Houston Moorman, and Kenosha Larkin, into the kitchen. Pearson and appellant indicated that the house was their drug selling turf. McDonald and McKnight offered to leave, but Pearson and appellant instead demanded that they empty their pockets; the pair produced about $1,800 in cash. Appellant ordered Larkin and Donaldson to leave, and, shortly thereafter, fired at McDonald and McKnight. Outside, Larkin and Donaldson heard gunshots and both women hid in nearby bushes. From this vantage point, they observed Pearson, Moorman, and appellant leave the house and drive away. McDonald survived the shooting, but McKnight did not.

Initial police interviews yielded only general descriptions of the two men involved in the shooting: a heavy-set black male and a taller, light-skinned black male. Neither Larkin nor Donaldson identified anyone by name after the shooting. Several weeks after the crimes, police detained Larkin on a juvenile arrest warrant to "develop" more information concerning the crime. During questioning, one of the officers, sitting close to Larkin in an interrogation room, was reading an interdepartmental memo concerning possible suspects in the shooting when Larkin stated "That's him." The memo contained photocopied pictures of appellant under the name "Levi." When Larkin asked to see the photo, the officer complied, and she identified appellant as "Levi." The officer testified at trial that, while he had no intention of showing Larkin the memo, she was able to see the picture through the paper, which he was holding facing himself.

Larkin, however, testified at trial that she was not able to see through the paper that the officer held. Instead, she recalled that he simply laid the memo photo out for her to view. Summarizing the officer's actions, Larkin testified that the officer said, "[H]e thinks this is the man, do he look familiar?" At trial the prosecution did not ask Larkin to identify defendant during direct examination. During cross examination, defense counsel elicited testimony that she chose his photo because "from that booklet that's the closest I could get from the way he looked." She also stated that she wasn't "for sure if that's him or not because I really didn't get a good look at his face."

Appellant presented an alibi defense at trial. Three individuals acquainted with appellant, his wife, a family friend, and an Illinois businessman and former police officer, testified that appellant was in Illinois during January and/or February 1993. None, however, could recall seeing appellant on January 9, 1993.

During trial, the prosecution subpoenaed Pearson, who had previously been convicted of second-degree murder in this matter, to testify. Despite an offer of immunity from further prosecution, Pearson refused to testify. The prosecution then sought to introduce Pearson's testimony regarding the crime he was convicted of from his own trial.[1] The trial court, however, granted a defense motion, made under *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), to exclude this testimony

---

1. Apparently, Pearson testified during his own trial that he was told that two males were "selling from their spot." He also testified that, when he and appellant entered 2817 Bryant, he had an automatic, while appellant was carrying a revolver. Pearson further testified that appellant fired at McDonald and McKnight. The prosecutor characterized all of this testimony as consistent with other testimony at appellant's trial and bolstering of Pearson's trial defense, which was, in the prosecutor's estimation, "I was there with [appellant] but I did not intend to kill anybody, it was [appellant]."

because of its "blame-shifting" nature. The prosecution then moved the trial court either to reconsider its ruling or to allow "testimony or a stipulation that Mr. Pearson * * * agrees that he was at 2817 [Bryant]," arguing that such a summary would capture the elements of Pearson's testimony that truly inculpated him. The defense opposed this motion, but the trial court ruled that, under *Williamson,* a statement that Pearson was present at 2817 Bryant "has some [indicia] of reliability and that would be only that the co-defendant was present at the address" and, therefore, allowed "just that statement."

Because Pearson did not testify specifically that he was at the scene of the crime, the trial court, the prosecution, and defense counsel conferred regarding a stipulated statement. Pursuant to that agreement, the trial court read the following to the jury:

> Members of the jury panel, I'm going to read to you a stipulation that has been entered into by the parties, and you should consider this as evidence in the case: The parties stipulate that Jamie Pearson, also known as Heavy, has admitted that he was present at 2817 Bryant Avenue North at approximately 7:30 p.m. on the evening of January 9th, 1993.

In addition to the Pearson stipulation, there was extensive testimony. Three eyewitnesses, Donaldson, Moorman, and the surviving victim, McDonald, testified that appellant had been the man with Pearson, who entered 2817 Bryant, threatened, and shot McDonald and McKnight. Larkin's testimony, though not as consistent, supported the testimony of these other witnesses. The murder weapon was not recovered, but forensic scientists testified that only one weapon was used to injure McDonald and kill McKnight, probably a .44 caliber revolver. The eyewitnesses testified that both Pearson and appellant were armed, appellant with a

revolver. The motive for the murder appeared to be a conflict over drug-selling territory. Several witnesses testified that McKnight and McDonald sold drugs from 2817 Bryant; some of these same witnesses, as well as appellant's wife, testified that appellant, who had previously lived at 2817 Bryant, had been involved in selling drugs as well. The trial lasted some four and one-half days.

After testimony, the trial court charged the jury. CRIMJIG 3.04[2] is the standard jury charge regarding unanimous verdicts in criminal cases; in this instance, however, the trial court opted to paraphrase CRIMJIG 3.04, rather than read it verbatim. The CRIMJIG includes the following language: "[i]n order for you to return a verdict, whether guilty or not guilty, each juror must agree with the verdict. Your verdict must be unanimous." The trial court, however, told the jury:

> There are 12 of you on this jury and all of you must agree to a verdict. Some of you may have been on juries in civil matters where you were permitted after so many hours of deliberation to return a so-called fractional verdict, in other words, some of you, not all of you could return a verdict in a civil case. But there are no fractional verdicts in a criminal case, and the jury's verdict must be unanimous.

After a full day of deliberation, the jury sent the trial court a note indicating it had reached an impasse. The trial court advised the jury to continue deliberating. After another day, the jury sent a note advising that:

> We the jury have reached a point of 11 members who believe the defendant was at the scene. One who believes there is enough doubt to not believe that the defendant was present. That one jurist [sic] has

2. The complete text of CRIMJIG 3.04 reads:
In order for you to return a verdict, whether guilty or not guilty, each juror must agree with the verdict. Your verdict must be unanimous. You should discuss the case with one another, and deliberate with a view to reaching agreement, if you can do so without violence to your individual judgment. You should decide the case for yourself, but only after you have discussed the case with your fellow jurors and

have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous but you should not surrender your honest opinion simply because other jurors disagree or merely in order to reach a verdict.
10 Minn.Dist.Judges Assn., *Minnesota Practice,* CRIMJIG 3.04 (3d ed. 1990).

concluded there is no reason or evidence to change that position.

The trial court denied a defense request for a mistrial and, as part of its instruction to the jury to continue, read CRIMJIG 3.04 to them. After a third day of deliberation, the jury returned with a guilty verdict.

### Admission of Co-defendant's Statement

Appellant first argues that the trial court erred when it admitted the stipulation summarizing the statements of a co-defendant. Arguing that the stipulation was not truly self-inculpatory as to the co-defendant, Pearson's, interest, but rather an attempt to serve his interest, appellant contends that the admission violates *Williamson*. Pearson's defense at his trial was that appellant was the triggerman and responsible for the actual killing and that he, Pearson, had no prior knowledge appellant planned to kill anyone. Because Pearson's testimony was blame-shifting, appellant contends, a predominantly self-inculpatory statement cannot be abstracted from it.

 The introduction of hearsay statements of a nontestifying co-defendant implicates both the Confrontation Clause of the United States Constitution and the general prohibition on the admission of hearsay evidence contained in the rules of evidence. *See* U.S. Const. amend. VI; Minn.R.Evid. 802 (1995). The United States Supreme Court has recognized that the hearsay rules and the Confrontation Clause protect similar values. *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 3145–46, 111 L.Ed.2d 638 (1990). But, while the two obviously overlap, the Confrontation Clause is not an absolute bar to the admission of hearsay evidence, though such admission does appear literally to violate the clause. *See, e.g., Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965).

 In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court established a two-part approach to determine when incriminating statements

that come within an exception to the hearsay rule are also permissible under the Confrontation Clause. *Id.* at 65, 100 S.Ct. at 2538–39. First, the declarant must be unavailable and, second, the statement will be admissible only if it bears adequate indicia of its reliability. *Id.* at 66, 100 S.Ct. at 2539. The trial court may infer reliability when the evidence falls "within a firmly rooted hearsay exception." *Id.* Otherwise the evidence must be excluded, unless the prosecution can show the statement contains "particularized guarantees of trustworthiness." *Id.* The Supreme Court has determined that several of the common hearsay exceptions are "firmly rooted," but has expressly declined to decide whether the "declaration against penal interest" exception, at issue in this case, is such a firmly-rooted exception. *Williamson v. United States,* 512 U.S. 594, ——, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994).[3]

Analysis of testimony proffered under the "declaration against penal interest" exception to the hearsay rule also involves two steps. Again, the declarant must first be unavailable. *See* Minn.R.Evid. 804(a). Second, the statement must "at the time of its making * * * so far [tend] to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Minn.R.Evid. 804(b)(3).

 The United States Supreme Court recently confronted the problems inherent in the question of admissibility of statements that are partly against interest and partly not. *Williamson,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476. A plurality of six justices held that the word "statement" should be narrowly construed; thus a statement is not a declarant's entire narrative, but rather only those portions which inculpate because only self-inculpatory expressions fulfill the exception's rationale for truthfulness. *Id.* at ——, 114 S.Ct. at 2435–36. According to *Williamson,* the factual circumstances surrounding a statement determine whether it was against the declarant's interest or not. *Id.* at ——, 114 S.Ct. at 2436–37. This court

---

**3.** The Court, however, also observed that the federal Courts of Appeals are divided on this issue. *Id.*

has adopted the reasoning of *Williamson.* In *State v. Ford,* 539 N.W.2d 214 (Minn. 1995), this court concluded that a trial court erred in admitting a statement that was non-self-inculpatory, but contained within it a largely self-inculpatory narrative. *Id.* at 227.[4]

The statement in this case is somewhat unusual. In each of the above cases, the admission of a *statement*—that is, words directly spoken by the declarant—was at issue. In this case, the trial court admitted a stipulation containing an inference drawn from Pearson's trial testimony. Pearson never actually said the words admitted into evidence, though his trial testimony contained statements sufficient to draw the necessary inference, namely that he was at 2817 Bryant during the commission of this crime.[5]

This issue involves two questions: first, whether the stipulation should be treated differently from a direct statement of a co-defendant, and second, whether the stipulation is sufficiently self-inculpatory as to come within the exception. Clearly, the inference reflected in the stipulation is a correct one, but nothing in the evidentiary rules or cases indicates how to treat a summary of a statement. Rule 801, which defines various terms for the section of the rules concerning hearsay, concludes that a statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Minn.R.Evid. 801(a).

■ We conclude that, because the stipulation contains an inference plainly permissible based on Pearson's actual testimony, the stipulation may be treated as if it were a direct statement. Trial courts may turn more frequently to such stipulations to avoid the difficulty of sorting the self-inculpatory from the nonself-inculpatory portions of a larger statement, but we caution that the

stipulation must be very closely tied to the actual statements in order to come within this holding.

■ Next, we must determine whether the statement that Pearson was present at the crime scene is self-inculpatory, such that it comes within the reach of Minn.R.Evid. 804(b)(3) as a statement against penal interest. As in *Williamson,* the statement at issue here was part of a larger statement that was indeed blame-shifting. While Pearson admitted that he went to 2817 Bryant to deal with two other people selling drugs on his turf and he went there armed, his overall testimony threw the bulk of the responsibility for the more serious offenses onto appellant.

This fact pattern was addressed precisely by the *Williamson* court, which wrote: "The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Williamson,* 512 U.S. at ——, 114 S.Ct. at 2435. Pearson's testimony, from which the statement at issue here was drawn, was precisely that: a broad confession of criminal activity that had the broader purpose of exculpating him. Although the statement at issue here does not by itself do so, Pearson was clearly trying to implicate appellant as the triggerman.

■ We conclude that the admission of this statement may have been error simply because it does not meet the basic requirement of Minn.R.Evid. 804(b)(3); that is, it is not clear that the stipulation, by itself, is self-incriminatory at all. That an individual was present at a crime scene by itself is not self-incriminatory—one may simply be a witness or even a victim of the crime. Viewed alone, Pearson's statement that he was present is

---

4. Prior to our adoption, in *Ford,* of the *Williamson* reasoning, a Minnesota trial court was under no obligation to attempt to parse out a witness' or co-defendant's statement to separate inculpatory from noninculpatory portions of the statement. This court had previously held that such an approach was acceptable, but not mandatory and, sometimes, not practical. *State v. Black,* 291 N.W.2d 208, 213 (Minn.1980).

5. For example:
 Q: So Levi got there first and knocked on the door?
 A: Yeah.
 Q: And you were right behind him?
 A: Yeah.
 Q: And someone let him in. Do you know who that was?
 A: No, I don't know who it was.

either neutral or perhaps even irrelevant, as it is not clear Pearson's presence had any bearing on whether appellant committed the crime charged, given his alibi defense. *See* Minn.R.Evid. 401, 402. Although a trial court has substantial discretion when making evidentiary rulings, *State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989), the defendant's ability to confront the witnesses against him is a constitutional right. *Wright*, 497 U.S. at 813, 110 S.Ct. at 3145.

However, a finding of constitutional error in a criminal trial does not require a new trial if the state can show beyond a reasonable doubt that the error was harmless. *State v. Scott*, 501 N.W.2d 608, 619 (Minn.1993) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). When applying the *Chapman* harmless error test, appellate courts must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993). If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt. *Id.*

To determine whether an error violating a defendant's right to confront witnesses is harmless, we must consider several factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *State v. Pride*, 528 N.W.2d 862, 867 (Minn.1995) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

These factors weigh in favor of finding harmless error in this case. The Pearson stipulated statement was not significant to the prosecution's case and was merely cumulative of other strong evidence against appellant. Such evidence includes a positive identification by one of the victims that was corroborated by similar accounts of the events of January 9 given by other witnesses.

Furthermore, Moorman, McDonald, and Donaldson all testified that appellant was one of the two men in the kitchen pointing guns at McDonald and McKnight. McDonald and Moorman further identified appellant as the one who opened fire on McDonald and McKnight. Given the peripheral nature of the Pearson stipulated statement and the strong evidence against appellant, we conclude that the error in admission was harmless.

### Improper Jury Instructions

Appellant next asserts that the trial court's instructions were improper and that the motion for a mistrial made at the time the jury said it was deadlocked should have been granted. Appellant's argument here is twofold. Specifically, he argues that the trial court erred first when it paraphrased CRIM-JIG 3.04 in its initial instructions, rather than reading the instruction precisely, and again when it twice instructed the jury to continue deliberating. In support of the latter charge, appellant points to the length of the trial, the complexity of the case, the volume and nature of the evidence, the number of charges, and the jurors' notes to the court and concludes that the jury had deliberated for a reasonable period of time and was unable to reach a verdict. According to appellant, it did so only because the trial court's initial instructions led the jury to believe that it would not be allowed to finish absent a unanimous guilty or not guilty verdict. This belief was bolstered when the trial court twice ordered the jury to continue deliberating despite the jury's contention that it had reached an impasse.

Trial courts have "considerable latitude in the selection of the language of the jury charge." *State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990). A defendant contesting the language chosen by the court "must show that the substituted instruction contained a material misstatement of law when read in the context of the instructions as a whole." *State v. Turnipseed*, 297 N.W.2d 308, 312 (Minn.1980). However, the choice of a jury charge should be approached with caution so as to avoid selecting language that might be misinterpreted. If a trial court's

instructions appear to have coerced a jury to reach a unanimous verdict, *State v. Martin,* 297 Minn. 359, 211 N.W.2d 765, 768–770 (1973), or allowed the jury to believe that a deadlock is not a possible outcome to their deliberations, *State v. Kelley,* 517 N.W.2d 905, 909 (Minn.1994), a new trial is necessary. Further, this court has never held that a trial court must read a *particular* charge— whether the language approved in *Martin,* CRIMJIG 3.04, or other language—to the jury prior to the commencement of deliberations. *See State v. Packer,* 295 N.W.2d 266, 267 (Minn.1980). The question here is whether the trial court's instructions, taken as a whole, contained a material misstatement of the law or coerced the jury to reach a unanimous verdict. We conclude they did not.

▆▆ Initially, we consider the argument that the trial court's paraphrased instructions were misleading. The paraphrased instruction in this case does pose some risk of misunderstanding. It is possible, for example, that the trial court's instruction that "[t]here are 12 of you on this jury and all of you must agree to a verdict" might have led some jurors to conclude that they had to reach a verdict. The trial court's charging instruction could also be interpreted as indicating that there were only two possibilities, guilty or not guilty:

> [I]t is fair to convict if the evidence and the law require it; in such a case, it is unfair if you do not convict * * * [o]n the other hand, it is fair and proper for you to find the defendant not guilty if you are not convinced of his guilt beyond a reasonable doubt.

The possibility of such mistaken interpretations is bolstered by the tenor of the jury's note indicating its 11 to 1 split. While the trial court's remarks may have been a well-intentioned attempt to illustrate distinctions regarding the jury's role in criminal, as opposed to civil proceedings, it is nevertheless possible that the jury might have been concerned that it was required to reach a unanimous verdict, guilty or not guilty.

Nevertheless, we conclude that the instruction, taken as a whole, was not an erroneous statement of the law. It is clear that the

trial court's final charge to the jury set out the elements contained in CRIMJIG 3.04, albeit in slightly different language, which is allowable under this court's decision in *Martin.* We have carefully reviewed the text of the trial court's remarks and find that the trial court's instructions, taken as a whole, did not so "stress[ ] the duty to decide" over the need for jurors to "consult and deliberate with a view to reaching an agreement consistent with their individual judgments" as to coerce the jury and therefore necessitate a new trial. *Martin,* 211 N.W.2d at 773. In light of the verbatim reading of that instruction at a later point in the jury's deliberations, we find no error.

Yet, we also believe that a cautionary note is necessary. While this trial court's initial instructions were "not coercive on their face, they did not provide the careful description of the obligations of the jurors, individually and collectively, which the *Martin* court approved." *Kelley,* 517 N.W.2d at 909. Our decision today is influenced by the ameliorative effect of giving the proper charge, CRIMJIG 3.04, when the jury reached a deadlock, but we emphasize that to do so is not a panacea. Moreover, we believe that confusion in jury charges can be avoided and so caution trial courts to exercise prudence and precision with jury instructions and to refrain from paraphrasing or summarizing instructions.

▆▆ Secondly, we consider whether there was error in the trial court's direction to the jury that it continue to deliberate. In general, contact between a judge and a jury after the jury has begun its deliberations should be minimal for fear that the jury may misinterpret the judge's instructions. This is not to say that judges cannot give additional instructions after a jury has begun to deliberate, as this is permitted by the rules of criminal procedure. Minn.R.Crim.P. 26.03, subd. 19(3). To deal with this difficult issue, this court approved the balanced approach of the American Bar Association's Standards Relating To Jury Trials and approved portions of them for use by trial courts confronted with a deadlocked jury. *Martin,* 211 N.W.2d at 772; *Packer,* 295 N.W.2d at 267. Standard 15–4.4(b) provides that if the trial

court believes the jury has been unable to agree, it "may require the jury to continue their deliberations and may give or repeat an instruction * * *. The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." *Kelley,* 517 N.W.2d at 909. However, as noted above, it is reversible error in Minnesota to coerce a jury towards a unanimous verdict. *See Martin,* 211 N.W.2d at 772–73. A court, therefore, can neither inform a jury that a case must be decided, *Id.,* nor allow the jury to believe that a "deadlock" is not an available option. *Kelley,* 517 N.W.2d at 909–10.

In this case, we conclude that the trial court's instructions to keep deliberating did not coerce the jury to reach a verdict so as to require a new trial under *Martin.* This was not a *Kelley* case, where the jury was unable to discern the limits of its obligations. Having earlier paraphrased CRIMJIG 3.04, the trial court properly responded to the jury's impasse by reading 3.04 verbatim. The combination of the two instructions, we believe, amounted to an adequate description of the jury's role and duty. Further, because the period of jury deliberations does not seem to us excessive in light of the length of the trial, the number of witnesses and the nature of the charges, we find no error. Neither the paraphrased initial instructions nor the later instructions to keep deliberating went beyond the discretion afforded a trial court in the management of the trial.

### Identification Procedure

■ Appellant next argues that Larkin's identification of his photo during police interrogation involved improperly suggestive procedures. Depending on which testimony one credits, Larkin either saw appellant's photo through the backside of a memo a police officer was reading during the interrogation or the police officer showed the photo to her outright. Either way, appellant contends,

the display of the photo was so impermissibly suggestive as to vitiate the identification.[6]

■ To determine whether a pretrial identification procedure violated appellant's due process rights, this court has adopted the two-part test contained in *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) (citing *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972)). *State v. Marhoun,* 323 N.W.2d 729, 733 (Minn.1982). First, the trial court should determine whether the procedure was unduly suggestive and, second, whether, in light of the totality of the circumstances, the identification evidence is reliable. *State v. Ostrem,* 535 N.W.2d 916, 921 (Minn.1995). There is no need to engage in the first part of this analysis, as the state admits that showing the photo to Larkin was suggestive.

■ Identifications which are the product of suggestive procedures may nevertheless be allowed into evidence if the circumstances demonstrate that the witness had an adequate independent origin for the identification. *Manson,* 432 U.S. at 116, 97 S.Ct. at 2253–54; *see, e.g., Ostrem,* 535 N.W.2d at 921. This court employs five factors detailed in *Manson* and *Biggers* for reviewing the totality of the circumstances surrounding the witness' opportunity to view the defendant. *State v. Bellcourt,* 312 Minn. 263, 251 N.W.2d 631, 633 (1977). Those factors include: the witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the witness' level of certainty at the photo display; and the time between the crime and the confrontation. *Ostrem,* 535 N.W.2d at 921.

Consideration of these factors casts a considerable pall over Larkin's pretrial identification. Larkin had an opportunity to view

---

6. The state admits that showing Larkin the photo right side up was suggestive, but contends that it was at Larkin's request and that no taint has occurred because Larkin made no in-court identification of appellant. However, the record suggests otherwise. On direct examination, the prosecutor asked Larkin if any of the men she saw that evening was present in the courtroom and Larkin responded that she was "not for sure

if that's him or not because I really didn't get a good look at his face, so I'm not just going to put it off on him because I really didn't see his face." In response, the prosecutor stated: "you're pointing at somebody; you're pointing at the [appellant]?" After Larkin responded affirmatively, the prosecutor asked that the "record reflect that the witness is pointing at [appellant]." *Id.* That is an in court identification.

appellant at the crime scene, but only for a short time before being told to leave the house. Larkin testified, however, that her attention was focused on Pearson's weapon, so much so that she did not notice whether the other person had a weapon or not. Larkin's description to police was not specific, so her prior description is only generally accurate. Larkin's vague description, the fact that a month had elapsed between the crime and the identification, and her admission that her attention was focused on one of the weapons, not the individuals, also suggest lack of reliability. That she was uncertain about confirming her original identification in court only bolsters the identification's infirmity.

▆▆ Taking into account all of the circumstances surrounding Larkin's opportunity to see appellant, we conclude that the admission of the identification into evidence was error. The admission of a tainted pre-trial identification raises significant due process concerns. However, like the erroneous admission of Pearson's statement, this error does not require a new trial if the state can show beyond a reasonable doubt that the error was harmless. *Scott,* 501 N.W.2d at 619.

Looking to the whole of the evidence on which the jury based its verdict, we find that the verdict was surely unattributable to Larkin's pre-trial identification. We detailed above the testimony of several witnesses who identified appellant, including the three witnesses—Moorman, Donaldson, and McDonald—who named appellant as the person who fired his weapon at McDonald and McKnight. The jury therefore heard a great deal of eyewitness identification evidence. The evidence presented in Larkin's testimony, like that offered by Pearson's statement, was more cumulative than prejudicial. Given the deference we accord jury verdicts and our unwillingness to overturn them without significant justification, *Roemer v. Martin,* 440 N.W.2d 122, 124 (Minn.1989), we believe that the identification procedure present in this case, though impermissibly suggestive, does not require the granting of a new trial.

## Sufficiency of the Evidence

▆▆ Appellant's last contention is that the evidence presented at trial is legally insufficient to sustain his conviction. Because physical evidence is lacking, he argues, the only evidence linking him to the crime came from unreliable witnesses. Trial testimony revealed that the witnesses had discussed the case prior to the trial testimony, implying collusion, despite a sequestration order. Friends of Larkin, for instance, spoke with McDonald while he was in the hospital, related their conversation to Larkin, who, in turn, repeated it as if it were first hand knowledge. Larkin testified that she spoke with others in an attempt to learn who had killed McKnight, calling this the "say so around." Moreover, she noted that her conclusion appellant was involved was, at least in part, because "it was suggested, it was just a speculation." Donaldson and Moorman also had conversations with each other prior to identifying appellant. Appellant cites no fewer than thirteen such incidents of pretrial, intra-witness conversation.

Appellant also highlights the fact that Donaldson was a crack cocaine user who had been smoking for three days without sleep prior to the evening of the crime. Lastly, appellant points to the Larkin identification of his picture to the officer. On the basis of these allegations and in the face of credible alibi testimony, appellant insists that the state failed to present evidence necessary to sustain the conviction.

▆▆ The general standard of review when an appellant claims the evidence is insufficient to sustain his criminal conviction is "whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude the defendant was guilty of the offense charged." *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988). Significant deference is accorded the jury's decision. *Id.* This court must view the evidence in the light most favorable to the prosecution and assume the jury believed the state's witnesses and disbelieved any contrary evidence. *Id.* (citing *State v. Race,* 383 N.W.2d 656 (Minn. 1986)). The jury is in the best position to evaluate the evidence surrounding the crime

and determine the credibility and weight given to the testimony of individual witnesses. *State v. Daniels,* 361 N.W.2d 819, 826 (Minn. 1985).

In light of the deference due the jury's determination, we conclude the evidence was sufficient. Appellant's counsel vigorously cross examined witnesses on many of the faults brought forward into this argument. The jury heard and, presumably, considered this information as well as the alibi evidence. Thus, we hold that sufficient evidence exists to sustain the conviction.

Affirmed.

COYNE, Justice (concurring specially).

I concur in the affirmance of defendant's conviction of first degree murder, Minn.Stat. § 609.185 (1994), and attempted first degree murder, Minn.Stat. § 609.17 (1994). I write separately only to add facts which confirm the harmlessness of any error in the admission of the stipulated portion of Pearson's testimony and in the admission of identification testimony by a witness who might have been influenced by a suggestive pretrial identification procedure.

Pearson's testimony at his trial for McKnight's murder took Pearson past the door of the house at 2817 Bryant Avenue North and into the kitchen where the armed robbery and murder took place. Pearson also testified that he carried an automatic. It is true that he attempted to shift the blame for the actual shooting onto defendant, who Pearson said not only had a revolver but that he fired at McKnight and McDonald. Passing off blame for the actual shooting on defendant Jones does not, however, in my opinion, make Pearson's statement non-self-inculpatory. We have previously ruled that a defendant who knows that his accomplice carries a gun during the commission of a burglary is liable for assaults committed by the accomplice in furtherance of the burglary. In short, Pearson's admission that he, as well as defendant, was armed when they confronted McKnight and McDonald and

robbed them, surely exposes Pearson to conviction for felony murder regardless whether it was he or defendant Jones who pulled the trigger. The error in admitting the stipulated inference that Pearson was present at 2817 Bryant lies not in what was admitted but in the exclusion of the admission that Pearson entered the kitchen and that he came armed to the encounter. Had the excluded portion been admitted there would be no question that the stipulation met the *Williamson* requirement for reliability. Moreover, the relevance of the statement to defendant's culpability would have been quite clear.

Although there can be hardly any doubt that if the display of the defendant's photograph was accomplished in the manner described by Larkin, the pretrial identification procedure was impermissibly suggestive, and Larkin's identification testimony should have been excluded. Of all the eyewitnesses Larkin seems to have been the only one to whom defendant Jones and Pearson were strangers. Donaldson, who lived in the house at 2817 Bryant, certainly was well acquainted with her sometimes upstairs tenants; she had initially declined to name them because she did not want to become "involved." After the shooting Moorman, who was Ms. Donaldson's boyfriend, left the house and drove away in the company of Jones and Pearson; he testified that Jones was the person who fired at McKnight and McDonald. McDonald, who survived the point-blank shooting, also identified defendant Jones as the shooter. In view of the wealth of strong, error-free evidence that it was defendant who shot McKnight and McDonald, any error in admitting Larkin's tentative identification of defendant as one of the two men who ordered her to leave the house could not reasonably have affected the verdict and was clearly harmless beyond any reasonable doubt.

Accordingly, I join the majority in affirming defendant's conviction.

KEITH, Chief Justice (concurring specially).

I join in the special concurrence of Justice Coyne.

PAGE, Justice (concurring specially).

I join in the special concurrence of Justice Coyne.

TOMLJANOVICH, Justice (concurring specially).

I concur with the result reached by the majority. I write only to emphasize that Jury Instruction Guides are just that—guides—that need not be followed slavishly. The guides are prepared by experienced trial judges to assist judges in fashioning instructions that are a correct statement of the law.

The duty of the trial judge is to instruct the jury on the rules of law which they must apply in arriving at their verdict. So long as those instructions are an accurate statement of the law, the judge need not be concerned about following the guide to the letter.